561 So.2d 847 (1990)
Phillip DAVIS, Jr., Plaintiff-Appellee,
v.
HUSQVARNA MOTOR, et al., Defendants-Appellants.
No. 21307-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 1990.
Rehearing Denied June 14, 1990.
*848 Davenport, Files & Kelly by Thos. W. Davenport, Jr., Monroe, for defendants-appellants.
Nelson, Hammons & White by John L. Hammons, Shreveport, C. Sherburne Sentell, Jr., Minden, for plaintiff-appellee.
Before HALL, MARVIN and SEXTON, JJ.
SEXTON, Judge.
This is an appeal by defendant-appellant, McKinney Saw and Cycle, Inc. (hereinafter referred to as "McKinney"), claiming numerous errors in the trial court's findings against it in favor of plaintiff-appellee, Phillip Davis, Jr. Plaintiff-appellee answers the appeal, also asserting error by the trial court. We amend and affirm as amended.

FACTS
During the year 1982, McKinney was the authorized and franchised dealer of products manufactured by Husqvarna Motor (hereinafter referred to as "Husqvarna"). These products, including power saws, were sold at retail by McKinney at its place of business in Ruston, Louisiana. Husqvarna is a Swedish corporation and has a factory representative in the United States. In 1982, Huskipower Outdoor Equipment Corporation (hereinafter referred to as "Huskipower"), with its home office in Charlotte, North Carolina, and a branch office in Shreveport, Louisiana, was the designated distributor for the products of Husqvarna in Arkansas, Mississippi, and Louisiana. The factory representative of Husqvarna dealt directly with the designated distributors who, in turn, dealt directly with the designated dealers in the geographical *849 territory assigned to each distributor. By this marketing scheme, McKinney was required to purchase new Husqvarna products and parts from Huskipower.
In October of 1982, McKinney purchased a Model 65 Husqvarna power saw from Huskipower for resale at retail. Huskipower had modified the vent valve on this model, and employees of McKinney who worked in its repair shop were aware of this modification. On November 16, 1982, McKinney sold a model 65 Husqvarna power saw to Mr. Robert Singleton, plaintiff's employer, without advising him of the alteration.
McKinney's records reflect that this saw was returned on two occasions for repair work, on December 4, 1984, and on December 14, 1984. On neither occasion did McKinney repair the vent valve or advise Mr. Singleton of its modification.
On March 5, 1985, plaintiff and his sons were cutting pulpwood for Mr. Singleton and were using his equipment in their efforts. On that morning, plaintiff and his sons fueled, oiled, and sharpened the chain of the Husqvarna chain saw before beginning their day's work. After the initial supply of fuel had been exhausted, one of plaintiff's sons refilled the saw with fuel and oil and left it in an upright position while plaintiff went to examine a large tree that had to be felled. After this examination, plaintiff returned to the saw and prepared to start it. He pulled the choke lever out, engaging the choke, and cranked the saw one time. On this crank, the saw popped, and he pushed the choke lever in. He then pulled the starter cord for the second time, at which point the saw and plaintiff's clothing burst into flames.
Plaintiff's sons extinguished the flames, and plaintiff was taken to the Bienville General Hospital emergency room. He was then transferred to the Burn Unit at LSU Medical Center in Shreveport, where he remained hospitalized until March 14, 1985. He was finally diagnosed with second and third degree burns over 18 percent of his total body surface, as most of his right side had been in flames. Plaintiff underwent extensive skin grafting procedures from March 25 through March 31, 1985, and was later readmitted to LSU Medical Center from January 10 through February 9, 1988, undergoing further treatment for complications which had developed with his skin grafting procedures. Plaintiff's total medical bills were $64,411.57. Additionally, plaintiff was rendered totally and permanently disabled from any employment whatsoever.
In suit filed on February 24, 1986, plaintiff named Husqvarna, Boswork Distributing Company (hereinafter referred to as "Boswork"), and McKinney as defendants. Boswork was joined on allegations that it was the distributor for Husqvarna and that the power saw in question had been acquired by McKinney from Boswork. Through later discovery, it was learned that Boswork did not become the distributor of Husqvarna until 1984 and that Huskipower was the distributor when McKinney acquired the power saw that it subsequently sold to Robert Singleton.
Prior to trial, plaintiff entered into a compromise of its claims against Husqvarna and Boswork, obtained an order of dismissal, and released these two parties. Plaintiff then proceeded to trial against McKinney. After trial, the jury returned its special verdict form, determining plaintiff's total damages to be $294,566.37 with fault apportioned as follows:

 Plaintiff 0 percent
 McKinney 20 percent
 Husqvarna 80 percent[1]
In accordance with the special verdict form, a judgment was rendered awarding plaintiff damages of $58,913.27 against McKinney, this being 20 percent of the total damages awarded.
Appellant McKinney has taken this suspensive appeal which was followed by an answer to the appeal by the plaintiff-appellee Daviseach party having assigned four errors. These assignments of error present the following six issues:
*850 (1) Extent of fault of McKinney and the plaintiff
(2) Extent of damages
(3) Extent of the judgment against McKinney
(4) Validity of plaintiff's motion in limine
(5) Assessment of expert fees
(6) Assessment of costs

FAULT OF McKINNEY AND THE PLAINTIFF
As is evidenced by the assignments of error, both parties contest the jury's findings of fault. The basis of McKinney's argument that the trial court erred in assessing any fault against it is that plaintiff did not prove that the modification of the vent valve on the saw which McKinney sold to Robert Singleton was the cause of the saw's explosion. The plaintiff contends that the jury was correct in finding that the saw was rendered unreasonably dangerous by Huskipower's modification to the vent value, based on the testimony of plaintiff's expert, Mr. Norman H. Sachnik.
The testimony at trial revealed that the chain saw manufactured by Husqvarna includes a fuel tank vent valve controlling the venting of the gas tank. The purpose of this valve is two-fold: First, it allows air to enter the gas tank from the outside to prevent the formation of a vacuum as the fuel is dispensed into the ignition system and carburetor. Second, it prevents the escape of gasoline from the tank through the valve. This valve is designed with a small stainless steel sphere approximately the size of a BB which moves upwards and downwards in a cylindrical slot inside the valve. When the sphere is down, it allows air to enter through the exterior opening at the top of the valve and pass into the fuel tank, thereby preventing the formation of a vacuum as gasoline exits the fuel tank into the ignition system. However, should the chain saw be turned over or should pressure from excessive fluids or vapors exist in the fuel tank, this sphere is forced upwards, where is seats, thereby preventing the inadvertent escape of flammable gasoline vapors or liquids.
According to Mr. Edward J. Barris, while the saw was in the possession of Huskipower, he and other employees of that corporation manually punched a hole in the top of the fuel tank vent valve by using a triangular chisel and a hammer. Mr. Barris testified that this modification was made to allow the pressure buildup in the gas tank to bleed off slightly faster than the valve in its present state would otherwise allow and that this modification was made after complaints by users of the saw that the saw would shut off when the engine became too hot. However, plaintiff's expert, Mr. Sachnik, testified that the punching of a triangular hole into the end of a circular valve destroyed the function of the valve by eliminating its ability to seat closed; therefore, both gasoline fluids and vapors could escape through the vent valve.
Based on Mr. Sachnik's testimony, the jury apparently chose to believe plaintiff's theory that the fire was caused by gasoline vapors and liquid which were allowed to escape and accumulate within the cowling of the saw near the spark plug as well as in the immediate area adjacent to the saw, these vapors becoming ignited when plaintiff attempted to crank the saw.
McKinney at trial tried to show that plaintiff in fact had no explanation for the cause of the fire. First, McKinney claims that plaintiff did not prove that there was an adequate supply of combustible material to start a fire such as that in the instant case. It claims that even Mr. Sachnik acknowledged that when the power saw is sitting in either an upright position or laying on its side with the oil and fuel openings upright and in a position to receive fluids (the only two positions that plaintiff and his sons testified that the saw was in on the morning in question), the vent valve is positioned at the very top and at the apex of height in the gas tank. In either of these positions, no fluid will escape through the modified vent valve. McKinney further claims that this fact was demonstrated in the presence of the jury by filling the fuel tank with water and placing it in both a side and an upright position. No fluid escaped in either situation. Further, *851 McKinney noted the presence in the tubing attached to the valve of a piece of porous felt material which is intended to permit the passage of air through the tubing but to obstruct the passage of particles and liquids. McKinney claims that this material would prevent the passage of a quantity of gasoline sufficient to start a fire the size of the one which burned plaintiff.
Although McKinney's argument is plausible, the jury apparently chose to believe plaintiff's theory that it was not necessarily liquid gasoline but gasoline vapors which escaped through the vent valve and caused the fire at issue. Mr. Sachnik testified that he ran numerous tests on not only the valve which was in the saw in question, but also on two similarly altered valves and on new, unaltered valves. He further confirmed that the perforated valve will allow a slow but steady leakage of gasoline fluids and vapors. The testimony of plaintiff and his sons revealed that plaintiff began using the saw at approximately 6:30 a.m. on the morning of the accident, running it constantly to cut pulpwood until it ran out of gas. He then immediately laid it down on its side and filled the hot gas tank with cool gasoline. He then walked away from the saw for a period of about 15 minutes, leaving it on the ground while he walked over to examine a large tree and determine the best way to fell it. Plaintiff's theory of the accident is that during the time he was examining the tree, the gasoline inside the tank was heating with resulting expansion and vaporization. Because the function of the valve had been destroyed by the perforation, a large volume of gasoline vapors[2] was allowed to escape inside the cowling and near the spark plug, with additional vapors accumulating around the saw itself. When plaintiff finally returned and attempted to crank the saw, a spark ignited the vapors, causing the resulting fire.
McKinney also claims that plaintiff did not prove a specific source of ignition for the fire. It claims that since the motor of the saw never began to run before the fire, the chain-drive spocket was not engaged, thereby eliminating the possibility of sparks from that source. McKinney also argues that, based on the testimony at trial, a "swooosh" sound began the fire, eliminating the possibility that the saw backfired. Finally, McKinney points out that both plaintiff and one of his sons was a smoker.
It is obvious that there was an ignition from some source. Whatever that source, the jury believed after viewing all of the evidence that the alteration of the saw's vent valve allowed enough gasoline vapors and/or liquids to escape from the gas tank and provided a combustible material to be ignited by a spark most probably caused when plaintiff was attempting to crank the saw.
The Louisiana Supreme Court has recently reiterated Louisiana's well-established standard of appellate review:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La.1978); A. Tate, "Manifest Error" Further observations on appellate review of facts in Louisiana civil cases, 22 La.L. Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or *852 jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La. 1985). In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. See, F. Maraist, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium, Civil Procedure, 40 La.L.Rev. 761, 764 (1980); Comment, Appellate Review of Facts in Louisiana Civil Cases, 21 La.L.Rev. 402, 412 (1961); Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989) (footnote omitted).
After having reviewed the record in its entirety, we cannot say that the jury's finding was clearly wrong in that the alteration of the vent valve of this Husqvarna saw was the cause of the fire which burned plaintiff.
Having determined that the jury finding of causation was not clearly wrong, we now turn to the correctness of the jury's assessment of liability. As stated above, the jury assessed 20 percent of fault against McKinney and the remaining 80 percent against the released manufacturer, Husqvarna.
The record supports the finding that the jury was not clearly wrong in assessing 20 percent of fault in this accident to McKinney. McKinney argues against this liability on the theory that Huskipower, not McKinney, enlarged the hole in the vent valve. However, this argument overlooks the fact that a retailer has an obligation to the purchaser and user of products that it sells to furnish a product that is free from known defects rendering that product unreasonably dangerous in its normal and intended use. A non-manufacturer/seller of a defective product is responsible for damages in tort if he knew or should have known that the product sold was defective and failed to declare it. LSA-C.C. Art. 2545; LeBleu v. Home Light Division of Textron, Inc., 509 So.2d 563 (La.App. 3rd Cir.1987); Harris v. Atlanta Stove Works, Inc., 428 So.2d 1040 (La.App. 1st Cir.1983).
At trial, John McKinney, owner of McKinney Saw and Cycle, Inc., and Joseph Foster and Jerry Rhodes, maintenance and repair personnel at McKinney, all testified that they had actual knowledge that the valve had been altered prior to the time that the saw was sold to Robert Singleton, although they never advised Mr. Singleton of this modification either at the time of the purchase or on the two subsequent occasions when the saw was returned by Mr. Singleton to McKinney for repairs. We find that there is substantial evidence to support the finding that McKinney had a duty either to replace the defective valve or advise Mr. Singleton of its existence. The failure to do either of the above constituted a breach of the duty owed both to Mr. Singleton and plaintiff. Therefore, we uphold the jury's assessment of 20 percent comparative fault as not being "clearly wrong." Rosell v. ESCO, supra.
McKinney also claims that the jury erred in assessing zero percent of fault against plaintiff. It claims that both Mr. Rhodes and Mr. Foster, the repair and maintenance personnel with McKinney, who were recognized and accepted as the experts in the field of chain saw repair and maintenance, examined the three-and-one-half-year-old saw and testified to the obvious use it had received, as well as to missing parts, such as a "control panel" and a "male blade connector" at the end of the ignition switch wire. McKinney further points out that with the exception of the two days that the saw was being repaired by it, the saw was in the possession, care, *853 and custody of plaintiff. McKinney therefore claims that plaintiff, who performed daily maintenance on the saw, should be held responsible for any condition of the saw which would cause it to ignite.
Plaintiff testified on rebuttal that all of the parts to this saw were present when he used it. Additionally, there was no evidence whatsoever that the general condition of the saw contributed in any way to the fire. Furthermore, McKinney's contention that the fire could have been caused by plaintiff's smoking is purely speculation since there was no evidence in the record regarding such. We therefore conclude that the jury's determination that plaintiff was free from fault is not clearly wrong.

DAMAGES
The jury in this case awarded plaintiff total damages of $294,566.37, this amount consisting of:

Past Medical Expenses $ 64,566.37
Future Medical Expenses 30,000.00
Impairment of Earning Capacity 100,000.00
Mental Anguish and Distress 25,000.00
Physical Pain and Suffering 25,000.00
Permanent Residual Disability 50,000.00

Plaintiff on appeal claims that the awards of $25,000 for physical pain and suffering, $25,000 for mental anguish and distress, and $50,000 for permanent injuries are inadequate and should be increased to $125,000 for physical pain and suffering, $75,000 for mental anguish, and $100,000 for permanent injuries. McKinney on appeal complains that the awards of $30,000 for future medical expenses and $100,000 for impairment of earning capacity are not supported by sufficient evidence.
Before a court of appeal can disturb a quantum award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Fields v. Senior Citizens Center, Inc., 528 So.2d 573 (La. App. 2d Cir.1988); Towns v. Georgia Casualty and Surety Company, 459 So.2d 124 (La.App. 2d Cir.1984). The Louisiana Supreme Court has pointed out:
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
Reck v. Stevens, 373 So.2d 498, 501 (La. 1979) (footnote omitted).
The evidence at trial concerning plaintiff's injuries included testimony of the plaintiff himself, along with medical records, photographs, and the testimony of Dr. Henry Middleton, the doctor who treated plaintiff at the Bienville General Hospital emergency room immediately after the accident, and Dr. Allen Pelletier, plaintiff's treating physician at the Burn Unit at LSU Medical Center.
As we noted above, plaintiff was taken to Bienville General Hospital emergency room immediately after the accident. After he was stabilized, he was transported by ambulance to the burn unit at LSU Medical Center in Shreveport. The evidence showed that plaintiff sustained second and third degree burns over 18 percent of his total body surface, including his right abdomen, hip, arm, hand, and thigh, which resulted in three periods of extensive hospitalization during which time plaintiff suffered through multiple debridements and skin grafts. Plaintiff was initially hospitalized for 10 days immediately after the accident, then for 7 days later in March of 1985, and finally for 30 more days starting in January of 1988.
*854 Dr. Middleton testified as to the initial treatment plaintiff received at the emergency room before being transported to Shreveport. Dr. Pelletier testified mainly as to the painful stages of treatment given plaintiff in the burn unit. He also noted that it was possible that the plaintiff would have to undergo periodic surgical treatment in the future, especially if the burned area became infected, as is a common occurrence. He also testified that he did not feel that plaintiff would be able to go back to work as a pulpwood cutter. However, the last time Dr. Pelletier saw plaintiff was during his residency at the medical center in Shreveport in March of 1985 during plaintiff's initial hospitalization and treatment.
Plaintiff was awarded the full amount of his medical expenses as demonstrated by hospital records in the amount of $64,566.37, which neither side complains of. As for his remaining medically-related general damages including mental anguish, physical pain, and residual disability, we cannot say that the jury abused its "much discretion" in the amounts awarded. Based on Dr. Pelletier's testimony, along with plaintiff's own description of his injuries and their lasting effects on his life, we feel that the total $100,000 awarded is not abusively low.
Likewise, the record fully supports the jury's award of $100,000 for impairment of earning capacity. Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the court must exercise sound judicial discretion and render awards which are consistent with the record and which do not work an injustice on either party. Robinson v. Graves, 343 So.2d 147 (La.1977); Nichols v. Stone Container Corporation, 552 So.2d 688 (La.App. 2d Cir.1989), writ denied, 556 So.2d 1262 (La.1990); Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984). Both plaintiff and Mr. Singleton, plaintiff's employer, testified that plaintiff earned $4 per cord cut and could cut an average of 25 cords per week when working. Assuming plaintiff worked 50 weeks per year, this would give him an annual income of approximately $5,000. Plaintiff was 44 years old when rendered disabled and claimed a work life expectancy of between 20 to 25 years. Given these figures, we cannot say that the jury erred in awarding plaintiff $100,000 for lost earning capacity.
On the other hand, we do not find that the record supports the jury's award of $30,000 for future medical expenses. When the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (La.1971); Landaiche v. Lou-Con, 461 So.2d 1107 (La.App. 5th Cir.1984). However, future medical expenses, even though often not susceptible of precise mathematical calculation, must be established with some degree of certainty. Awards will not be made for future medical expenses which may or may not occur, in the absence of medical testimony that they are indicated, and setting out their probable cost. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144 (La. App. 2d Cir.1988); Zachary v. Travelers Indemnity Co., 533 So.2d 1300 (La.App. 3rd Cir.1988); Kimble v. Wal-Mart Stores, Inc., 527 So.2d 1163 (La.App. 3rd Cir.1988), writ granted, 532 So.2d 164 (La.1988), affirmed in part, amended in part, 539 So.2d 1212 (La.1989).
Dr. Pelletier's testimony indicated that plaintiff's skin grafts would never restore his skin to its normal condition and that the grafted areas are less sensitive and occasionally shrink and pull. He also noted the potential problem of infection in a burn site. Thus, Dr. Pelletier testified that additional surgery is normally required to deal with the deformities and residual difficulties of skin grafts. Specifically with respect to plaintiff, he testified that "with an injury as severe as Mr. Davis sustained, I would say the likely answer is yes [with respect to surgery]."
Thus, the record indicates that future surgery is likely. Although the specific *855 nature of that surgery and the approximate cost thereof is not detailed in the record, we do have in evidence the bills for plaintiff's extensive hospitalizations. From these we are able to conclude that an award of $15,000 for future medical expenses is supported by the record.

EXTENT OF THE JUDGMENT
Plaintiff contends by supplemental brief that the trial court erred in signing the instant judgment which only awarded plaintiff $58,913.27, or 20 percent of the total damages, against McKinney Saw and Cycle, Inc. Plaintiff contends that since the record does not support a finding of negligence on the part of Husqvarna, defendant McKinney is responsible for 100 percent of the damages.
We agree with plaintiff that this record will not support the jury's assessment of 80 percent of the fault to Husqvarna, the manufacturer of the saw. According to Louisiana products liability law as it existed at the time of plaintiff's accident, for liability to attach in a products liability case, it is essential that the injured person prove that the harm resulted from the condition of the product, the condition made the product unreasonably dangerous to normal use, and that the defect complained of existed at the time the product left the possession of the manufacturer. Gines v. State Farm Fire and Casualty Co., 516 So.2d 1231 (La.App. 2d Cir.1987), writ denied, 519 So.2d 127 (La.1988); Stevens v. Rex Chainbelt, Inc., 349 So.2d 948 (La. App. 1st Cir.1977), writ denied, 351 So.2d 164 (La.1977); Frey v. Travelers Insurance Company, 271 So.2d 56 (La.App. 4th Cir.1972), writ refused, 273 So.2d 840 (La. 1973). Alterations and repairs by persons other than the manufacturer will tend to negate the inference that the defect existed at the time of manufacture. Norris v. Bell Helicopter Textron, 495 So.2d 976 (La.App. 3rd Cir.1986), writ denied, 499 So.2d 85 (La.1987).
In the instant case, Ed Barris, a representative of Huskipower, readily admitted that personnel at his company punched the hole in the vent valve; there seems to be no dispute as to who made the alteration that was found by the jury to be a defect in the saw. The evidence shows no knowledge of Husqvarna, either actual or imputed, of the defect, since the defect did not exist at the time it left the manufacturer's hands. Additionally, there was no evidence at trial that Husqvarna authorized the alterations made by Huskipower or even knew about them. Mr. Barris, the general manager for the local division of Huskipower, stated that his company made the unilateral decision to modify the valve. Furthermore, there was no evidence in the record that any other distributors in the United States performed the same type of alteration of Husqvarna saws. In fact, plaintiff's expert, Mr. Sachnik, testified that he was able to obtain an unaltered vent valve from a Houston distributor.
We thus conclude that the jury's assessment of 80 percent of the fault to Husqvarna on this record was clearly wrong in that there was no evidence that Husqvarna made the alteration or even had any knowledge of it.
Because Husqvarna is not liable for the injuries of plaintiff, McKinney and Husqvarna are not solidary obligors. LSA-C.C. Art 2324.[3] The release of a party who is subsequently determined not to be a solidary obligor does not affect the extent of liability of the remaining defendants. Hall v. Hartford Accident & Indemnity Co., 278 So.2d 795 (La.App. 4th *856 Cir.1973), writ denied, 281 So.2d 753 (La. 1973); Harvey v. Travelers Insurance Co., 163 So.2d 915 (La.App. 3rd Cir.1964). The rationale for this rule is that there is no patent unfairness to the remaining defendants as their right to contribution is not impaired because the released party is not a joint tortfeasor. Wall v. American Employers Insurance Co., 386 So.2d 79 (La. 1980).
It may well be that in assessing fault against Husqvarna the jury was really considering Husqvarna's distributor, Huskipower, who altered the chain saw. This speculation is of no moment, however. McKinney is still liable for the entire amount of this judgment because it has been determined to be negligent, and the plaintiff has been determined to be free from negligence. LSA-C.C. Arts. 2315 and 2323. If Huskipower is indeed a joint tortfeasor, then McKinney still has the option to pursue that company for contribution. LSA-C.C.P. Art. 1113; Thomas v. W & W Clarklift, Inc., 375 So.2d 375 (La.1979).

PLAINTIFF'S MOTION IN LIMINE
Plaintiff also complains that the trial court denied its motion in limine. By this motion, plaintiff unsuccessfully attempted to preclude evidence of the negligence or fault of any entity other than McKinney on the trial of the case, as well as other related relief. Because of our determination that the plaintiff may collect the entirety of the award from McKinney, we need not consider this contention by plaintiff. We therefore pretermit discussion of it.

EXPERT WITNESS FEES AND COSTS
McKinney also appeals the trial court's award by ex parte proceeding of $7,358.42 to plaintiff as the expert witness fee of Mr. Sachnik. The only evidence before the court of the amount of Mr. Sachnik's work in the case was presented in the form of an invoice submitted to the court after trial in which Mr. Sachnik summarized his duties, hours worked, and expenses incurred in the case. Based on this invoice, the trial judge assessed the $7,358.42 bill for Mr. Sachnik's services against McKinney in his judgment.
An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. A trial court has discretion to fix the amount of the fee. McGee v. Miears, 516 So.2d 1241 (La.App. 2d Cir.1987); Northwest Insurance Company v. Borg-Warner Corporation, 501 So.2d 1063 (La.App. 2d Cir. 1987); Coon v. Placid Oil Co., 493 So.2d 1236 (La.App. 3rd Cir.1986), writ denied, 497 So.2d 1002 (La.1986). LSA-R.S. 13:3666 B[4] allows the trial court to fix expert witness fees either from the testimony adduced at trial on the merits or by rule to show cause brought against the party cast in judgment. McGee v. Miears, supra; Northwest Insurance Company v. Borg-Warner Corporation, supra; Coon v. Placid Oil Co., supra. However, a trial court may not value services performed by an expert away from its hearing and observation without competent and admissible evidence to support that evaluation. Northwest Insurance Company v. Borg-Warner Corporation, supra.
On cross-examination Mr. Sachnik could not testify to either when he was hired by plaintiff or the approximate amount of hours he had worked on the case, nor did he bring his file with him to the courtroom. Further, as we have already noted, these costs were assessed ex parte rather than by rule to show cause.
Because Mr. Sachnik neither testified at trial as to his duties or the hours he worked on the case, nor was there a rule to *857 show cause brought against McKinney in order that plaintiff could prove by competent evidence what services and expertise Mr. Sachnik had rendered in addition to that demonstrated at trial, we determine that the trial court erred in its ex parte assessment of Mr. Sachnik's fee. We will therefore remand for a hearing solely for the purpose of assessment of Mr. Sachnik's expert witness fee in accordance with law.
McKinney also complains of the assessment by the trial court of all of the costs against it since the trial court judgment only assessed McKinney with 20 percent of the plaintiff's total damages. Since we have found that the defendant McKinney is liable for the entirety of plaintiff's damages, we find it unnecessary to further consider this contention.

CONCLUSION
In conclusion, we have determined that the jury was not clearly wrong in assessing the defendant McKinney with 20 percent of the fault for the instant accident and in determining that the plaintiff was free from fault therein. We have concluded that the jury was clearly wrong in assessing fault against Husqvarna. As a result, the defendant McKinney is liable for the entirety of the damages assessed herein. We have further concluded that the jury's assessment of damages is not abusively low and that the the award of loss of future income is likewise not an abuse of discretion. However, we have concluded that the jury award for future medical expenses should be reduced to $15,000. We have agreed that the trial court erred in its assessment of an expert witness fee and will remand solely with respect thereto. We further have concluded that it was unnecessary to consider that plaintiff's complaints with respect to the motion in limine and the defendant's complaint with respect to assessment of costs. The judgment of the trial court will therefore be amended and recast as follows:
IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that there be judgment herein against McKinney Saw and Cycle, Inc., and in favor of Phillip Davis, Jr., in the amount of $279,566.37, together with legal interest thereon from February 24, 1986, until paid in full, and for all costs of these proceedings.
The award of the expert witness fee to Mr. Sachnik is set aside, and the case is remanded solely for reconsideration thereof.
AMENDED, AFFIRMED AS AMENDED, AND REMANDED.

ON APPLICATION FOR REHEARING
Before HALL, MARVIN, SEXTON, FRED W. JONES, Jr. and NORRIS, JJ.
Rehearing denied.
NOTES
[1] Neither party requested the addition of Huskipower to the special verdict form as a non-party to whom fault could be apportioned in accordance with LSA-C.C.P. Art. 1812C(2).
[2] Each witness who was questioned about the nature of gasoline testified that it is the gasoline vapors which are flammable rather than the liquid itself.
[3] LSA-C.C. Art. 2324 as it existed in 1985:

Art. 2324. Liability for assisting or encouraging wrongful act
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
[4] LSA-R.S. 13:3666 B reads as follows:

B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) from the testimony adduced upon the trial of the cause, the court shall determine the amount thereof and include same or,
(2) by rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.