MARVIN, Judge.
From a judgment awarding damages arising out of a one-ear accident on a parish road, the driver and the police jury appeal, complaining of the trial court’s allocation of fault, 75 percent to the driver and 25 percent to the police jury.
Each litigant, of course in different respects, also complains of the monetary damages found by the trial court.
We find no clear error or abuse of discretion and affirm the judgment.
FACTS
Slocum Road, a two-lane north-south asphalt road in rural Ouachita Parish, extends for three miles and connects easterly and westerly highways, U.S. 80 and La. 15. About a month before the accident, the parish placed two “Low Shoulder” warning signs on each side of the road. The posted speed limit was 35 mph.
Susan Miller, the 19-year-old plaintiff driver, had traveled Slocum Road almost daily for about 1 — 1½ months before the accident, going to and from a vo-tech school near West Monroe in her stepfather’s 1981 Chevrolet pickup truck. As Ms. Miller was northbound from school on a clear, dry afternoon of July 24, 1985, she allowed the truck’s right wheels to drift onto the east shoulder of the road as she entered a curve. Ms. Miller took her foot off the accelerator, tapped the brakes and remained partially on the shoulder for about 170 feet, when she saw a mailbox on the east shoulder. Reacting, she steered sharply to the left to avoid the mailbox. Her abrupt maneuver headed the truck onto and obliquely across the paved road. Again reacting, Ms. Miller steered sharply to the right to keep the truck in its proper lane on the road, causing the truck to start sliding in a clockwise rotation.
There was virtually no shoulder on the opposite or west side of the road. The asphalt there abruptly ended in a drop-off of four to seven inches, perpendicular to the road surface. When the truck’s left rear wheel slid and dropped off the road, the wheel broke from the axle and the truck overturned, causing injury to Ms. Miller. She’ received emergency room treatment for a comminuted fracture of her left clavicle or collarbone.
Ms. Miller alleged that the west shoulder or side of the road where the truck overturned was unreasonably dangerous. She did not allege any defect in the east shoulder either as a cause of her injuries or as a cause of her driving on the east shoulder. Expert witnesses agreed that the sharp drop-off on the west side of the road caused the truck to overturn.
The sheriff's deputy who investigated the accident incorrectly reported the posted speed limit as 45 mph instead of 35. He wrote in the accident report that Ms. Miller was going 50 mph when she entered the curve before driving on the east shoulder. At trial, the deputy could not recall whether Ms. Miller told him of her speed or whether he merely estimated her speed from the physical evidence of the truck’s path. The deputy acknowledged, however, that he could not calculate her exact speed from the physical evidence. Ms. Miller was cited by the deputy with failure to maintain control of her vehicle.
Ms. Miller testified she was going 35-40 mph in what she thought was a 45 mph zone when she entered the curve. Her accident reconstruction expert, Ray Herd, estimated her speed was 35-40 when the truck began sliding after it re-entered the road, and opined she was going 40-45 mph when she first entered the curve. The police jury’s expert, Dr. Olin Dart, agreed *906 that her speed was about 35-40 when she began sliding but estimated her speed as high as 50 mph when she entered the curve. Both experts agreed she was going about 20 mph when the truck slid into the drop-off and overturned.
The sharp drop-off was located in front of a home on the west side of the road, where visitors often pulled vehicles directly off the road and parked in the front yard instead of using the driveway of the home. A resident of the home who heard tires squeal just before the accident saw that the truck was partially off the east side of the road in the curve. She saw the course of the truck thereafter until it overturned.
Tire squealing begins as a vehicle approaches the “critical speed” of a curve. This is the maximum speed at which the vehicle could travel through the curve without going completely off the road, according to the experts. Herd estimated the critical speed of this curve as 48 mph and Ms. Miller’s maximum speed going into the curve as 40-45 mph. Dart gave a higher estimate of both the critical speed, 50-55 mph, and Ms. Miller’s speed, 45-50 mph. Notwithstanding this slight difference in expert opinion of the curve’s critical speed, the experts agreed that Ms. Miller approached, but did not reach, the critical speed of the curve, under their respective estimations, when she drifted onto the east shoulder.
Herd estimated that the truck’s right wheels were a foot lower than the left wheels when Ms. Miller was partially on the east shoulder. He described the east shoulder slope as “gradual.” He gave this opinion of what caused the loss of control (with our emphasis):
When she came back on [the road] she had to [steer] a little bit more [to the left] than you would on level surface to get back — and she didn’t have time to turn back to the right before she crossed the center [line]. Then when she did turn it back she turned it too far and it went out of control.
Dart also opined that Ms. Miller's attempt to correct the truck’s path by steering sharply to the right after she re-entered the road caused the truck to slide out of control. He estimated the difference between the right and left wheels at the re-entry point as about seven inches. He also described the east shoulder slope as gradual, saying it was “very traversable.”
Ms. Miller said that she was “not alarmed” about the truck’s path until she encountered the drop-off on the west side of the road. Both experts agreed that the truck probably would have continued sliding to a stop, gradually and without overturning, had the west shoulder been level with the road.
FAULT
The trial court found that the abrupt and severe drop-off of four to seven inches on the west side of the road was unreasonably dangerous even for motorists driving on the east side of the road, and that the drop-off, more probably than not, caused or contributed to Ms. Miller’s injuries.
Because of Ms. Miller’s familiarity with the road, her excessive speed when entering the curve, and the manner in which she steered the truck thereafter, the court found that she “was grossly negligent ... [saying she] was an accident looking for a place to happen.”
Ms. Miller contends the court was clearly wrong in finding her 75 percent at fault. She argues that any negligence on her part was only moderate or slight compared to the “tripping mechanism of the drop-off on the west side of the road,” which caused the truck to overturn.
Ms. Miller argues that the only possible negligence on her part “would have been her speed prior to going off of the right [east] shoulder of the road.” This statement overlooks the fact that her own expert witness attributed her loss of control of the vehicle to her steering the truck “too far” to the right after she re-entered the road. We shall assume that her reaction to the mailbox on the east shoulder [her conscious choice to drive back on the paved roadway] was a reasonable reaction. We must agree, however, that it was her exces *907 sive speed entering the curve and her excessive steering thereafter, first to the left and then to the right, that caused her to encounter the defective drop-off on the west side of the road.
Because of the above circumstances, the police jury contends Ms. Miller’s percentage of fault should be increased from 75 to 90 or 100 percent, primarily because she had regularly driven on Slocum Road before the accident and should have seen and heeded the “Low Shoulder” warning signs which had been in place for about a month before the accident. On this record, we cannot agree.
There were two warning signs on each side of the road. One was within a few hundred feet of each end of the road. The second (on each side) was placed a mile or so from the first sign. The accident occurred about 9/io of a mile after Ms. Miller’s northbound entry onto Slocum Road from Hwy. 80. This record does not contain expert testimony about advisable placement, number and position, of warning signs.
While the two signs on each side of the road clearly gave some warning of the general road conditions, the drop-off on the west side where the truck overturned was markedly different and more dangerous than the gradual sloping shoulder on the east side. Under these circumstances, neither the presence of the signs nor the driver’s familiarity with the general road conditions warrants our modification of the fault allocated by the trial court. These and other factors were properly considered and weighed by the court in comparing the conduct of the litigants as directed by Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
We do not disturb factual findings of respective percentages of fault under CC Art. 2823 unless we find and can articulate why the findings are clearly wrong. This principle of appellate review prevails, notwithstanding that different triers of fact may apportion fault for similar conduct at different percentages. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984). We find no clear error in the fault apportionment in this record. See and compare Efferson v. State, Through Dept. of T. & Dev., 463 So.2d 1342 (La.App. 1st Cir.1984), writs denied; and Hayes v. State, Through Dept. of Transp., 467 So.2d 604 (La.App. 3d Cir.1985), writ denied.
DAMAGES
The trial court summarized the medical evidence:
The plaintiff has ... seen three orthopedic specialists ... She saw each of the doctors only one time. All three diagnosed her injury as a fractured clavicle, or collarbone, and, possibly, a fractured second rib. All seemed to indicate that, normally, a fractured clavicle, although giving pain and discomfort for some time, usually heals within some twelve weeks or so and that the main treatment is being careful not to re-fracture or aggravate the injury_ Plaintiff’s vigorous physical activity and employment post injury certainly suggests more probably than not that any increased disability would have long since been manifested and that she has been left with no more than the maximum ten percent disability of the left upper extremity as found by Dr. Brown.
At the time of the accident in July 1985, plaintiff was a 19-year-old high school graduate who lived with her sister in Oua-chita Parish. She had completed about six months of an 18-24 month computer training program at the Ouachita Parish Vo-Tech School after moving to Louisiana from Texas, where her mother and stepfather lived. She returned to Texas after the accident because this was her second accident in a one-month period. She did not resume the computer training after she moved back to Ouachita Parish in late 1986.
About a year after the accident, in June 1986, Ms. Miller enlisted in the Air Force for four years. She passed the pre-induction physical examination after reporting her injuries from the accident. Pain from these injuries prevented her from completing basic training. Further medical evaluation by Air Force doctors showed that she *908 did not meet the' minimum medical standards required for enlistment. She received an “entry level separation” instead of a “disability separation.” Had her injury occurred while in service, apparently she would have met medical standards to remain in the Air Force. She was involuntarily discharged in July 1986 for “erroneous enlistment,” apparently because her injury occurred before she enlisted.
The trial court awarded Ms. Miller $15,-329 in lost past earnings, representing the difference between the amount she would have earned in the Air Force and the amount she earned from other work she did in the two years between her Air Force discharge and trial. Most of the work she did during that time involved riding, training, feeding and grooming horses, work she enjoyed and had done before the accident.
CONTENTIONS
The police jury contends there is no factual basis for this award because Ms. Miller did not receive a disability discharge and “could have remained in the Air Force had she made the effort.” The Air Force records, while admittedly confusing, do not support this contention.
The records indicate that Ms. Miller’s discharge was based on her injuries from the accident, which should have made, but initially did not make, her ineligible to enlist when she was examined for her pre-in-duction physical. Ms. Miller was notified that classification of her separation as “entry level” rather than “disability” precluded her from claiming any military “disability retirement or severance.” She was also notified of, and waived, her right to “give evidence” in her favor if she wanted “to stay in the Air Force.”
The records show, in our opinion, that Ms. Miller was deemed “medically unfit to join the Air Force” because of her injuries from the accident. Her pre-induction physical was deemed by the Air Force to have been “erroneous.” Because she did not, and apparently could not, produce medical evidence contrary to the physical findings of the Air Force doctors, we cannot conclude that Ms. Miller had any realistic chance of remaining in the Air Force, “had she made the effort” as the police jury argues.
The record shows that Ms. Miller desired to enlist in the Air Force and did so, but was later deemed not medically fit to enlist because of her injuries from the accident. The award for past lost earnings, perhaps more accurately described as being for past lost earning capacity, is supported by Ms. Miller’s Air Force records and by the testimony of an economist who calculated the difference between her expected Air Force earnings and her actual earnings before trial.
Ms. Miller contends the award for past lost earnings should be increased to $23,273, the difference between her actual earnings and what she could have earned from computer work beginning in the summer of 1986, according to her economist. The trial court described this figure as speculative because she did not resume her computer training in or after 1986, when she was physically able to do so. We do not disturb, as an abuse of discretion, the trial court’s assessment of her industry and credibility on this issue. See and compare Harris v. Bardwell, 373 So.2d 777, 785 (La.App. 2d Cir.1979).
The trial court made no award for loss of future earnings or earning capacity. Ms. Miller asks for $81,695, the difference between an Air Force career income and computer job income, according to her economist.
The fundamental inquiry in claims for loss of future earnings or earning capacity is whether the plaintiff is disabled from doing work for which he or she is fitted by training and experience. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984).
From the testimony of Ms. Miller’s vocational rehabilitation expert, and from the evidence that she performed the same type of physically demanding work with horses that she performed and enjoyed before the accident, the trial court found:
[I]t would be most speculative to believe that plaintiff would have [completed] her computer training or that she was suited for a life as a computer technician ... [or that she] was oriented toward a career in *909 the Air Force.... The evidence has shown, more probably than not, that plaintiff is still able to do whatever she was able to do prior to this accident and this is further buttressed by the fact that she has not attempted to better her education or vocational training in the three years since this accident. ... Plaintiff is obviously able to work and earn what her education, training and experience enables her to earn.
These findings are supported by the record and preclude an award for loss of future earnings or earning capacity. See and compare Wilson v. Magee, 367 So.2d 314, 317 (La.1979); and Turner v. Safeco Ins. Co. of America, 472 So.2d 43, 49 (La. App. 1st Cir.1985).
Finally, Ms. Miller contends the $15,000 general damage award is inadequate. She does not, and we cannot, on this record, articulate, any factual basis to allow us to say that the court abused its discretion in assessing damages. Under these circumstances, we do not compare the award to others made for similar injuries. Reck v. Stevens, 373 So.2d 498 (La.1979).
DECREE
Costs of the appeal are assessed one-half to each litigant. The judgment is
AFFIRMED.