658 So.2d 820 (1995)
Frances Virginia WILLIAMS, Tutrix, Plaintiff-Appellee,
v.
CITY OF MONROE and State of Louisiana (DOTD), Defendants-Appellants.
Kenneth Wayne WATSON, et al., Plaintiffs-Appellees,
v.
CITY OF MONROE and State of Louisiana (DOTD), Defendants-Appellants.
Nos. 27,065-CA, 27,066-CA.
Court of Appeal of Louisiana, Second Circuit.
July 3, 1995.
*824 Nanci Summersgill, Monroe, Richard Bailey, Bastrop, for City of Monroe and State (DOTD), appellants.
Sedric E. Banks, M. Randall Donald, Monroe, for Frances Virginia Williams, Kenneth Wayne Watson, et al., appellees.
Before HIGHTOWER, and STEWART, JJ., and EDWARDS, J. Pro Tem.
EDWARDS, Judge Pro Tempore.
This suit arises from an accident involving a single vehicle which occurred on December 29, 1988. As a result of the accident, the driver died instantly and the four minor occupants of the vehicle were injured. Negligence and strict liability actions were filed against the State of Louisiana, through the Department of Transportation and Development (DOTD), and the City of Monroe (Monroe). After a trial on the merits, Deborah Watson, the deceased driver, was found to be 33% at fault and the defendants were found to be 67% at fault. Of the 67% fault assessed to the defendants, two-thirds (45%) was assessed to the DOTD and one-third (22%) was assessed to Monroe. DOTD and Monroe have appealed. Frances Virginia Williams, as provisional tutrix of the minor children, has answered these appeals. For the foregoing reasons, we affirm in part, amend in part, and affirm as amended.

FACTS
On December 29, 1988, at approximately 3:30 p.m., Deborah Watson was driving her 1973 GMC pickup truck westbound across the DeSiard Street Bridge (a/k/a Endom Bridge), which links downtown Monroe with West Monroe, Louisiana. The passengers in the front bench seat of the pickup truck were her three young children (Chad Rowton, Tonya Thompson, and Mitchell Dale Watson) and a nephew (Joel Thompson).
Immediately after crossing the bridge's movable center span, the pickup truck veered to the left and then back to the right. At an angle, the truck impacted a 10" barrier curb, climbed over the curb, traveled along an asphalt-filled area behind the curb, and eventually mounted the concrete railing on the north side of the bridge. The truck then slid a distance along the top of this railing, teetered there momentarily, and fell to the riverbank below, landing on its cab. Deborah Watson was killed instantly; her children and nephew survived, sustaining various injuries.
Two lawsuits were filed on behalf of Deborah Watson's three children against DOTD and Monroe, and a third lawsuit was filed on *825 behalf of Joel Thompson. Both defendants were sued as owners of the bridge. The lawsuits were consolidated and separate trials were ordered on liability and quantum. After ruling on costs on October 6, 1993, and issuing a ruling on the cross claims, including apportionment of fault, the trial court signed a comprehensive judgment on liability and damages on February 22, 1994.
In this appeal, Monroe adopts by reference the argument on assignments of error numbers one, two, four, five, six, seven, and eight, as submitted by DOTD. In addition, Monroe assigns as error the trial court's failure to address its claim for reimbursement and/or indemnification against the DOTD; this is addressed under assignment of error number three. The plaintiffs have assigned six errors, five of them relating directly to defendants' assignments of errors numbers three, four, five, and eight. Plaintiffs also assert that the trial court abused its discretion in awarding the three minor plaintiffs insufficient wrongful death sums for the loss of their mother, and it failed to award legal interest on all damages.

STANDARD OF REVIEW
The multiple issues presented in this appeal primarily consist of questions of fact. In order to reverse the fact finder's determinations of fact, the appellate court must review the record in its entirety and meet a two-part test. Theriot v. Lasseigne, 93-2661 (La. 7/5/94), 640 So.2d 1305 (citing Stobart v. State, through DOTD, 617 So.2d. 880, 882 (La.1993)). The appellate court must find from the record that there is no factual basis for the finding of the trial court, and must further determine that the record establishes that the trier of fact is clearly wrong or manifestly erroneous. Id.

ASSIGNMENT OF ERROR NUMBER 1

Unreasonable Risk of Harm
In this assignment of error, DOTD contends the trial court erred in finding that the condition of the DeSiard Street Bridge created an unreasonable risk of harm to motorists. The trial court, in its written reasons for judgment, made a determination that the "curb-filled area-shortened curb combination" on the DeSiard Street Bridge presented an unreasonable risk of harm and constituted a "defect" which caused Deborah Watson, who was also negligent, to lose control of the truck she was driving and go over the bridge guardrail.
Under the theories of both negligence and strict liability, the duty of DOTD is the same and liability hinges on whether it has breached its duty. DOTD's duty to travelers is to keep the roadways for which it is responsible in a reasonably safe condition. Whether it has breached its duty, i.e., whether the roadway at the scene of the accident was in an unreasonably safe condition, will depend on the facts and circumstances of each case. Design standards both at the time of original construction and at the time of the accident may be relevant factors for consideration in deciding this issue, but are not necessarily determinative. Theriot v. Lasseigne, supra; Hunter v. DOTD, 620 So.2d 1149 (La.1993); LSA-R.S. 9:2800; and LSA-C.C. Arts. 2315, 2317.
In the case at hand, the reconstructed DeSiard Street Bridge, on which the accident occurred, had been in place since 1978. Plans to reconstruct the bridge were initiated in 1974 as a result of damage it sustained after being struck by a barge. William Conway, a civil engineer with the firm of Modjeski & Masters which specializes in bridge design, testified that the City of Monroe called Modjeski & Masters in April of 1974 and asked if the firm would be willing to render its services to formulate a plan for reconstruction of the bridge. The firm accepted the offer. Subsequently, the Louisiana Legislature passed a resolution directing the Louisiana Department of Highways (predecessor to DOTD) to assume responsibility for the restoration of the bridge. Mr. Conway testified that the firm was in the early stages of evaluating and formulating a plan when the state replaced Monroe as its employer.
According to Mr. Conway, the design was formulated with two goals in mind: to put the roadway back into operation and to conform to the planned reconstruction of the *826 entire bridge. Mr. Conway testified that the bridge was redesigned in accordance with the American Association of State Highway & Transportation Officials (AASHTO) standards insofar as they were not modified by the client (DOTD). DOTD made some design modifications allegedly to fit the particular exigencies of the reconstruction situation. Mr. Conway stated that the reconstruction was to be completed in two stages. Only the first stage was actually completed.
The first phase of construction consisted of the bridge roadway being artificially narrowed by the placement of 10" barrier curbs on each side. The space between the curb and the bridge railing was filled with asphalt for the purpose of drainage and to prevent the collection of trash. The effect of this artificial narrowing was to reduce the width of the two lane bridge from 30' to 17'2", which effectively reduced each 15' lane to a 8'7" lane. The sloped asphalt-filled area between the 10" curb and the bridge railing served to reduce the effective height of the bridge railing from 32" to 20".
The resulting modified design of the DeSiard Street Bridge did not meet the then-current AASHTO standards. Mr. Conway testified that the first phase of reconstruction was more or less a temporary design intended to remain for a small number of years, i.e., two to three years. Following the completion of the first phase of reconstruction, the bridge was re-opened to traffic in 1978.
Mr. Conway stated that he learned later that small cars and trucks did not function well with a 10" curb barrier and required more height to confine them to the roadway. He also admitted that even one car going off the DeSaird Street Bridge might be enough to indicate the bridge should have been reconstructed differently.
Both plaintiffs and defendants presented expert witnesses at trial who were well-qualified in their fields. These witnesses testified as to whether the reconstructed bridge presented an unreasonable risk of harm to motorists. Dr. Anthony Galli, Mr. Jarvis Michie, and Mr. Russell Lewis testified as expert witnesses on behalf of the plaintiffs. Dr. Richard Robertson, took the stand on behalf of the defendants.
Dr. Galli, a professor of physics at Louisiana Tech University, qualified as an expert in accident reconstruction. In Dr. Galli's opinion, the truck driven by Ms. Watson was traveling between 15 to 20 mph westbound on the DeSiard Street Bridge. He stated that if the height of the railing had been 32" the vehicle would not have gone off of the bridge and, at worst, it would have rolled onto its side on the bridge. According to Dr. Galli, Deborah Watson's fate was more or less sealed the moment the front right wheel of her truck struck the 10" curb.
Mr. Michie, a civil engineer employed by Dynatech Engineering, testified that there were several problems regarding the design of the DeSiard Street Bridge and stated that he based his evaluations and opinions on information that was available to the defendants at the time the bridge was reconstructed. First, he testified that the lanes were extraordinarily and unnecessarily narrow. Second, he testified that the effect of the 10" curb and its placement was to cause vehicles that struck it to behave in an unpredictable manner. Third, Mr. Michie stated that the 20" bridge railing was an inadequate barrier and fell below AASHTO standards requiring a "non-safety" shaped barrier of at least 27" in height or a "safety" shaped barrier of at least 32". He concluded that the reconstructed portion of the DeSiard Street Bridge, particularly the railing, was nonfunctional and only tended to destroy the efficacy of a state-of-the-art bridge rail system.
While agreeing that there were certain instances where the AASHTO standards might need to be waived, i.e., when there are no reasonable alternatives, Mr. Michie testified that he could find no legitimate reason in the present case for the violation of the standards. In his opinion, the bridge could have been designed to meet those standards at no additional costs.
The testimony and reasoning of Russell M. Lewis, an expert in highway engineering and traffic safety, impressed the trial court the most. His testimony was consistent with the testimony of Dr. Galli and Mr. Michie. Mr. Lewis testified that the curb and the asphalt-filled area between the curb and bridge railing *827 had the operational effect of removing approximately 6'6" of pavement from each lane of traffic use, decreasing vehicular mobility, and making the entire structure functionally obsolete. He declared that the design of the bridge was a result of bad engineering and it created a clearly defective condition in that its system of redirecting vehicles was ineffective. In his opinion, the state spent more money to reconstruct a defective bridge than it would have spent had it done the job properly, safely, and in accordance with current standards. Mr. Lewis testified he could find no reasons which justified the substandard design.
Finally, Dr. Richard Robertson, a self-employed consulting civil and structural engineer, offered his expert testimony on behalf of the defendants. On direct examination, he testified that he would not place a barrier curb, i.e., a 10" curb, on a "high speed" facility. He defined a "high speed" facility as one permitting traffic speed of 40 mph or more. Upon cross-examination, Dr. Robertson, who stated that he would classify the bridge as a "low speed" facility, acknowledged that the "design speed" indicated on the construction plans for the DeSiard Street Bridge was 40 mph.
Dr. Robertson also testified that the truck driven by Ms. Watson came into contact with the 10" curb on the bridge at a "drift" angle (one that does not exceed three to four degrees). According to Dr. Robertson, a vehicle traveling at 20 mph, and impacting the 10" curb of the bridge at a drift angle, would have easily been redirected. In the present case, at least three witnesses testified with respect to the truck's speed. Mr. Todd Sylvester, one of the investigating officers at the scene of the accident, noted in the accident report that the vehicle was estimated to have been traveling at 15 mph. Mr. Benjamin Green, an eyewitness to the accident, maintained that Ms. Watson had been driving no faster than 18 mph, the speed at which he was driving. Dr. Galli concluded, from his calculations, that Ms. Watson was driving between 15 and 20 mph at the time of the accident. The trial court concluded that she was driving from 18 to 20 mph.
If we believe that Dr. Robertson was correct in stating that the truck impacted the 10" curb at a drift angle, then we must necessarily conclude Dr. Robertson's testimony (that a vehicle impacting the curb at a drift angle at 20 mph would have easily been redirected) is false. It is an established, undisputed fact that the Watson vehicle, which the evidence indicates was traveling from 15 to 20 mph and which Dr. Robertson claims struck the curb at a drift angle, was not redirected back onto the roadway and instead ended its journey on the riverbank below the DeSiard Street Bridge.
Additionally, the record reflects that the bridge was inspected by DOTD every two years throughout the eighties, and copies of the inspection reports were forwarded to Monroe. The reports contained itemized ratings relating to the various parts of the bridge structure. The evidence shows that under a section of the inspection reports labeled "Traffic Safety Features," the bridge railing consistently received an item rating of "one," a critical rating. Nothing was done in response to these ratings. The "temporary" construction completed back in 1978 was still in place ten years and two accidents later, a fact which led the trial court to determine that the state failed to complete phase two of its reconstruction plan for this bridge within a reasonable amount of time and, thus, created an unreasonable risk of harm.
Apparently, the trial court gave the most weight to the testimony of Mr. Lewis regarding the defective design of the bridge. Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is more critical. Theriot v. Lasseigne, supra (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La. 1990)). We may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety, even in the instances where we feel our own evaluations are more reasonable. Theriot v. Lasseigne, supra.
Having thoroughly reviewed the record, we find that the trial court did not commit manifest error in finding that the condition of the DeSiard Street Bridge was defective and that it created an unreasonable risk of harm *828 which resulted in the plaintiffs' injuries. This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER 2

Discretionary Function Exception
In this assignment of error, DOTD claims that it is immune from liability pursuant to LSA-R.S. 9:2798:1. The statute provides:
Sec. 2798.1. Policy-making or discretionary acts or omissions of public entities or their officers or employees
A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
. . . . .
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
Under this statute, public entities, such as DOTD, are not liable for their officers' or employees' discretionary acts. The discretionary function exception to state governmental liability set forth in the aforementioned statute is essentially the same as the federal discretionary function exception contained in the Federal Tort Claims Act. Fowler v. Roberts, 556 So.2d 1 (La.1989), Kniepp v. City of Shreveport, 609 So.2d 1163 (La.App.2d Cir.1992), writ denied, 613 So.2d 976 (La.1993).
Judicial interference in executive actions involving public policy is restrained by the discretionary function exception to state liability. LSA-R.S. 9:2798.1; Rick v. State, Department of Transportation and Development, 93-1776 (La. 1/14/94), 630 So.2d 1271; Fowler v. Roberts, supra. Whether a choice made by a governmental entity is a policy-making decision as contemplated by the discretionary immunity statute is a question of fact. Thibodeau v. Mayor & Councilmen of Morgan City, 619 So.2d 595 (La.App. 1st Cir.), writ granted in part and remanded, 629 So.2d 362 (La.1993) (remanded to court of appeal for reconsideration of the award of total damages; writ otherwise denied).
A two-step analysis is used to determine whether the discretionary function exception to state liability is applicable to a particular case. White v. State through the Dept. of Public Safety & Corrections, 93-2034 (La.App. 1st Cir. 10/7/94), 644 So.2d 684; Rick v. State, Department of Transportation and Development, supra; Ayers v. Brazzell, 26,068 (La.App.2d Cir. 9/21/94), 648 So.2d 406. First, a court must determine whether the action is a matter of choice. If no options are involved, the exception does not apply. Id. Second, if the action involves a selection among alternatives, the court must then determine whether the choice was policy based. Id. The kind of discretion that is shielded by the exception is one which is grounded in social, economic, or political activity. LSA-R.S. 9:2798.1; Ayers v. Brazzell, supra.
In the present case, the action at issue is the state's decision to reconstruct the DeSiard Street Bridge at standards below those set forth by AASHTO. LSA-R.S. 48:35 mandates that, if possible, DOTD shall meet minimum safety standards regarding roadways, such as highways and bridges, under its care and custody. This comports with DOTD's duty to maintain public roads in a *829 safe condition, including the provision of proper safeguards or adequate warnings of dangerous conditions on the highway. See Reid v. State Through the Dept. of Transp. & Development, 25,778 (La.App.2d Cir. 5/4/94), 637 So.2d 618, writ denied, 94-1415 (La. 9/16/94), 642 So.2d 198. See also Johnson v. State Through Dept. of Transp. and Development, 497 So.2d 768 (La.App. 3rd Cir.1986), writ denied, 501 So.2d 231 (La.1987).
The state argues that the process by which the reconstruction design of the DeSiard Street Bridge was chosen and accepted involved decisions made by the engineering personnel at the highest levels of the Louisiana Department of Highways (predecessor to the DOTD). According to the DOTD, the decisions represented the exercise of discretion based upon particular expertise, and were within the course and scope of the lawful powers and duties of the state agency. It avers that the resulting design was premised upon the public policy consideration consisting of the desire to avoid the hazard of a head-on collision on the bridge or a collision with the center span itself. It further avers that LSA-R.S. 48:35A(1) allows for such engineering judgment. The statute provides:
Section 35. Minimum safety standards of highway design, maintenance and construction; exemptions
A. (1) The office of highways of the Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter, the state highway system shall conform to such safety standards.
(2) The chief engineer may designate those highways as listed in R.S. 48:191 on the effective date of this Section for reconstruction or repair at standards which are less than those as approved by the American Association of State Highway and Transportation Officials; however, no reconstruction or repair shall be done on any highway under this Part which results in a pavement width of less than eighteen feet, and all reconstruction or repair done under this Part shall be accomplished within the existing right of way.
(3) Prior to January 1, 1987, the office of highways of the Department of Transportation and Development shall adopt specific minimum safety standards with respect to highway and bridge design, construction, and maintenance for all public roads, highways, and streets under the jurisdiction of any political subdivision of this state and not in the state maintained highway system. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials....
LSA-R.S. 48.35 is intended to protect motorists and pedestrians by setting minimum safety standards with respect to the design, construction, and care of highways, bridges, and other roadways. According to this statute, the DOTD shall conform as far as possible to the minimum safety standards promulgated by AASHTO with respect to highway and bridge design, construction, and maintenance. The legislature could not have intended that DOTD be allowed to waive the standards at random. The verb "shall" indicates that DOTD is mandated to meet such standards, except when it is impossible. LSA-R.S. 48:193(E) and LSA-R.S. 48:35 provide no discretion to DOTD concerning minimum safety standards.
DOTD's duty, to adopt minimum safety standards with respect to roadways, was extended to the DeSiard Street Bridge in 1974 or 1975 by a resolution (passed by the Louisiana Legislature) expressly directing DOTD to redesign and reconstruct the damaged bridge. DOTD undertook this responsibility and, therefore, was obligated to follow the same safety standards applicable to the other roads within its care and custody.
In the case at bar, Mr. Michie and Mr. Lewis, plaintiffs' expert witnesses, testified that there were reasonable design alternatives. In their opinion, there were no *830 justifications for deviating from the AASHTO standards with regard to the reconstruction of the DeSiard Street Bridge. We find that engineering decisions transcend the "operational" level to become "policy-oriented" decisions only when meeting the minimum safety standards is impossible.
After a review of the record, we determine that the trial court was not manifestly erroneous or clearly wrong in finding that the discretionary function exception was inapplicable to the present case. The evidence indicates that DOTD did not act in accord with its statutory mandate. Failure to meet AASHTO standards, when there are no impediments, constitutes a breach of the Department's duty to the public. DOTD cannot "pick and choose" when it will adhere to the minimum safety standards imposed by LSA-R.S. 48:35. Such discretion does not lie with it. "Rather than exercising discretion, the department abdicated responsibility." See Fowler v. Roberts, supra. The discretionary function exception only covers the exercise of discretion or choice, and if there is no choice or alternative involved, there is no immunity. Id. This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER 3

Apportionment of Fault
DOTD urges that the trial court erred in finding it 45% at fault for the accident of December 29, 1988. The trial court's apportionment of fault may be disturbed only in event of manifest error. Thibodeau v. Mayor & Councilmen of Morgan City, supra; Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), the court held:
We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
"In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed."
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson v. State Farm Fire & Cas. Ins. Co., supra.

a. Fault As Between Defendants & Driver of Vehicle
A motorist's duty of reasonable care includes the duty to keep his vehicle under control and to maintain a proper lookout for hazards. Orillion v. Carter, 93-1190 (La.App. 1st Cir. 6/24/94), 639 So.2d 461, writ denied, 94-2289 (La. 11/18/94), 646 So.2d 384. In the present case, we agree with the trial court's finding that Ms. Watson was negligent when she failed to keep her vehicle within the narrow traffic lane. Our comparison of the relative duties of Ms. Watson, DOTD, and Monroe convinces us that the trial court was not manifestly erroneous or clearly wrong in its apportionment of fault.
We will never know why Ms. Watson veered from her lane. The record reflects that there were no defects in the road itself. The evidence shows that nothing significant was sought by her conduct and she had the capacity to avoid the entire accident by staying in her lane of traffic. "But for" Ms. Watson's conduct in straying from her lane, the accident would not have happened. Ms. Watson might have never encountered the unreasonable risk of harm created by the defendants if she had not been negligent.
*831 Although we feel that Ms. Watson's conduct was an equally contributing cause of the harm suffered as a result of the accident, we cannot substitute our own evaluations for those of the trial court when the trial court's evaluations are also reasonable. See Orillion v. Carter, supra; Thibodeau v. Mayor & Councilmen of Morgan City, supra; Campbell v. Louisiana Department of Transportation and Development, 93-628 (La.App. 3rd Cir. 3/23/94), 635 So.2d 1224, writ granted, 94-1052 (La. 9/2/94), 642 So.2d 1273; Stephens v. Town of Jonesboro, 25,715 (La. App.2d Cir. 8/19/94), 642 So.2d 274, writ denied, 94-2351 (La. 11/29/94), 646 So.2d 400); and Reid v. State Through the Dept. of Transp. and Development, supra. In the case at bar, we may not disturb the trial court's findings. See Theriot v. Lasseigne, supra. The trial court's findings are reasonable and, therefore, they are not clearly wrong or manifestly erroneous. Therefore, we conclude that the trial court did not err in its apportionment of fault.

b. Fault Between DOTD & Monroe
The evidence indicates that Monroe owned the bridge, but that the State was given the responsibility of reconstructing the bridge after it was damaged by a barge in the early seventies. Regardless of which defendant owned the bridge, both defendants had care and custody of the bridge. While the State is primarily responsible for the substandard reconstruction which contributed to the accident of December 29, 1988, the City had a duty to protect the public, including Deborah Watson and the other occupants of the truck, from unsafe conditions. Both defendants are at fault, DOTD to a greater degree.
As to the apportionment of fault between DOTD and Monroe, we conclude that the trial court's finding was not manifestly erroneous or clearly wrong. See Thibodeau v. Mayor & Councilmen of Morgan City, supra.

c. Reimbursement/Indemnification As Between DOTD & Monroe
The trial court failed to address the issue of contribution or indemnification. Therefore, we will address it here. Both Monroe and DOTD had custody of the bridge at the time of the accident. Monroe was responsible for the navigational operation and day-to-day maintenance of the DeSiard Street Bridge, and DOTD reconstructed the bridge and inspected the bridge every two years. The trial court found that, pursuant to LSA-C.C. Art. 2324, the defendants were solidarily liable to the extent necessary to allow the plaintiffs to recover fifty percent of the damages awarded above.
"Where the actual fault of the proximate cause of harm is attributable to one party and another party is only technically or constructively at fault, for the failure or omission to perform some legal duty, indemnity may be had against the party primarily responsible for the act which caused the damage." Thibodeau, supra (citing Appalachian Corporation v. Brooklyn Cooperage Company, 151 La. 41, 91 So. 539 (1922)). Indemnity is available in only some cases of strict liability. To determine whether indemnity is available in a particular case, the court must examine the basis for imposition of strict liability.
In Dusenbery v. McMoRan Exploration Co., 458 So.2d 102 (La.1984), the Louisiana Supreme Court held that the defendant-owner of an oil well (which contained an unreasonably dangerous condition), although solidarily liable to the plaintiff as the owner of the well, was entitled to full indemnity against the defendant-contractor whose employees created the unreasonably dangerous condition. A plaintiff in a case involving a defective thing may recover his damages from either the owner of the structure; the party who actually created the risk (whether or not he is the owner of the structure); or from a party who knew of the dangerous condition, had a duty to correct it, and failed to do so.
In the case at hand, plaintiffs filed suit against owner of the bridge (Monroe) and the party which allegedly created the unreasonable risk (the state). The state knew of the dangerous condition (it created the condition), had a duty to correct it (pursuant to a resolution), and failed to do so (i.e. completed the first phase of reconstruction in *832 a substandard manner and never completed the second phase of the reconstruction).
Where two parties are liable for plaintiffs' injuries, the defendant who is liable only as the owner of the unreasonably dangerous structure should be made whole by the defendant who actually caused the unreasonably dangerous condition for which the owner is strictly liable. The fact that the law imposed liability on the owner does not detract from the owner's right to indemnification against the party who actually created the dangerous condition. Id.
After reviewing the record, we conclude that the City of Monroe is entitled to indemnity from DOTD because DOTD created the risk while Monroe was merely technically at fault.

ASSIGNMENT OF ERROR NUMBER 4

Excessive Expert Witness Fees
Pursuant to a post-trial rule for costs, trial court fixed the fees of the expert witnesses who testified for the plaintiffs. DOTD submits the trial court erred in awarding, and taxing as costs, excessive expert witness fees for Leighton Stamps ($2,000), Cornelius Gorman ($3,000), Harold Ginzburg ($3,000), and Melville Wolfson ($1,500). These witnesses were called during the quantum portion of the trial.
An expert witness is entitled to reasonable compensation for his court appearance and preparatory work. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App.2d Cir.1991). The fixing of the fee amount is within the trial court's discretion and will not be altered on appeal absent a showing of an abuse of discretion. Id. (citing Davis v. Husqvarna Motor, 561 So.2d 847 (La.App.2d Cir.), writ denied, 569 So.2d 958 (La.1990)); Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App.2d Cir.1988); McGee v. Miears, 516 So.2d 1241 (La.App.2d Cir.1987). The trial court in the present case, having witnessed the entire trial, was in an excellent position to observe the complexity of the case, the need for extensive trial preparation, and the actual presentation of evidence at trial. The trial preparation and testimony of each of the expert witnesses in question is summarized as follows:
Dr. Leighton Stamps, a licensed psychologist, has a Ph.D. and is a Professor of Psychology at the University of New Orleans. He had been certified as a clinical psychologist expert in over 100 cases. Here, the trial court did not accept him as an expert in vocational rehabilitation as the plaintiff had requested, but as an expert in psychology. Dr. Stamps conducted background research on the children injured in the accident, including interviews with their grandmother, a review of their report cards, and a review of reports and depositions of various health care professionals, i.e., Dr. Poole, Dr. Ginzburg, Dr. Murphy, Dr. Clay, and Dr. Thomason. He also conducted examinations of the children. At trial, he testified in detail as to the results of these examinations, including an analysis of various I.Q. tests he had administered. Finally, he testified as to the care the children would need in the future.
Dr. Cornelius Gorman, a licensed vocational rehabilitation counselor, testified to the employability and earning potential of Mitchell Watson before and after the accident. He also testified to the life care needs required for Mitchell. In preparation for his testimony, Dr. Gorman reviewed physician reports, hospital records, educational reports, and depositions of other witnesses. He personally counseled Mitchell and had conferences with Drs. Stamps and Ginzburg. He was present for the testimony of Dr. Stamps.
Dr. Harold Myron Ginzburg, the Senior Medical Consultant for the United States Public Health Service, was accepted by the trial court as an expert in both preventive medicine and neuropsychiatry. He testified that he had examined Mitchell Watson, Tonya Thompson, and Chad Rowton and interviewed their teachers and grandmother. His preparation for trial included an examination of the medical records, school records, as well as the psychological records of the children. According to testimony, he prepared reports summarizing the relevant medical testimony. Finally, he gave his opinion regarding Mitchell's medical condition and its *833 affect on the child's future. With respect to Tonya Thompson's damages, Dr. Ginzburg agreed with Dr. Murphy's diagnosis of major depression.
Dr. Melville Wolfson, a Professor of Economics at the University of New Orleans, was qualified by the trial court as an expert in forensic economics. He made particular calculations concerning the loss of future earning capacity and future medical expenses of Mitchell Dale Watson. In addition to preparing his own report, he reviewed written reports and consulted with Drs. Stamps and Gorman. He testified, to a small degree, in response to hypotheticals regarding Chad Rowton's wage impairment.
The instant case was very complex with respect to the quantum issues, as is shown by the lengthy record. After thoroughly reviewing the record, we conclude that the trial court did not abuse its discretion in awarding, and taxing as costs, a total of $9,500 in expert fees.

ASSIGNMENTS OF ERROR NUMBERS 5, 6, 7, & 8

Quantum
DOTD urges that the trial court erred in its assessment of the following general damages: Chad Zane Rowton ($200,000); Tonya Kay Thompson ($60,000); and Mitchell Dale Watson ($160,000). DOTD further urges that the trial court erred in the assessment of $60,000 as damages for Mitchell Dale Watson's loss of earning capacity. The plaintiffs' contend, with respect to the damages awarded to Mitchell Dale Watson, that the trial court erred in: (1) failing to factor in the expertise of Dr. Stamps in its assessment of damages for Mitchell Watson's loss of earning capacity and, thus, award a greater amount; and (2) in failing to afford greater weight to the opinions of the treating physicians, as opposed to the independent medical examiners, and, thus, award sufficient general damages to Mitchell Watson. First, we will address the assignments of error pertaining to the general damage awards.
In Rick v. State, Department of Transportation and Development, supra, the Louisiana Supreme Court stated:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979)] to the present case is that the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
Id. (citation omitted). Prior awards under similar circumstances should only be considered after the appellate court determines that the trial court abused its discretion. Campbell v. Louisiana Department of Transportation and Development, supra.
With respect to each of the following discussions pertaining to the general damage awards, parties do not dispute the existence of the victims' injuries, only the amounts awarded.

A. General Damages ($200,000)Chad Zane Rowton
In its partial ruling on damages, the trial court summarized Chad's injuries resulting from the December 29, 1988 accident as follows: Chad, age 12, who suffered multiple, small abrasions over his entire body, was transported to St. Francis Medical Center in Monroe. He underwent exploratory surgery as a result of his complaints about abdominal pain. Consequently, the surgeons discovered that Chad's liver had ruptured, and he underwent further surgery to suture his liver. Five to eight drains were placed in his abdominal *834 cavity to remove fluids and were removed slowly over a period of ten days.
Chad spent a total of eighteen days in the hospital, ten of them in the Pediatric Intensive Care Unit. His recovery was remarkable, considering evidence presented which indicated that 80% to 90% of people with ruptured livers die. Approximately one month after the accident Chad returned to school, but his activities were restricted for approximately three to four months. His diaphragm, which had been paralyzed as a result of the accident, has regained some mobility.
The trial court also took into consideration Chad's disease. In 1991, several years after the accident, he was diagnosed as having Crohn's disease (chronic ulcerative colitis). His treating physician could not find any relationship between the cause of this disease and the December 29, 1988 accident. However, the trial court apparently considered the physician's opinion that people with Crohn's disease get worse if subjected to stress. Based on the totality of the aforementioned evidence, the trial court awarded $200,000 in general damages to Chad. We determine that, although no evidence was presented definitively linking the cause of Chad's disease to the December 29, 1988 accident, the trial judge was entitled to consider the effect that the stress generated by the accident and resulting injuries may have on the aggravation of the symptoms relating to Chad's disease.
Additionally, plaintiffs mention that a 24" scar which remains on Chad's torso is embarrassing and will serve as a daily reminder of the tragic accident. They also point out that the child had to receive "eight bottles" of blood and he was on life support for five of his ten-day confinement to the Pediatric Intensive Care Unit.
After taking into consideration the multiple injuries sustained by Chad, we cannot say that the trial court abused its discretion in its assessment of Chad Rowton's general damages. This assignment of error is meritless.

B. General Damages ($60,000)Tonya Kay Thompson
The record reflects that as a result of the December 29, 1988 accident, nine-year-old Tonya suffered facial lacerations, an open fracture of the right humerus, a displaced fracture of both bones of the right forearm, a laceration of the extensor tendon, and an open PIP joint in the right small finger. An orthopedic surgeon performed a debridement and a pinning of the humerus. He also performed a debridement and a repair of the extensor tendon in the open joint injury of the small finger. Tonya's right arm was placed in a cast from below the shoulder to the base of the fingers and a splint was placed on her finger.
She was discharged from the hospital on January 14, 1989 and, thereafter, returned to the orthopedist for five follow-up visits. Tonya has a 5-inch permanent scar on her arm and has suffered some depression. There was no evidence showing that she would suffer any permanent physical disabilities because of the accident.
We find that the trial court did not err in awarding $60,000 in general damages to Tonya Thompson. This assignment of error is meritless.

C. General Damages; Loss of Earning CapacityMitchell Dale Watson
The defendants contend that the trial court abused its discretion in awarding excessive damages, including general damages and loss of earning capacity, to Mitchell. The plaintiffs, on the other hand, urge that the trial court erred in awarding insufficient damages. In particular, the plaintiffs assert that the trial court erred in giving more weight to the opinions of the independent medical examiners rather than the opinions of the treating physician.
In assessing the amount of damages due to Mitchell, the trial court stated in its partial rule for damages that the opinions of Dr. Susan Clay are generally accepted where her opinions differ from those of Dr. DeBora Murphy, Dr. Kenneth D. Pool, and Dr. Harold M. Ginzburg. He further stated that he took all of the evidence into consideration in calculating Mitchell's damages.
*835 It is true that the opinions of a treating physician are entitled to more weight than those opinions of doctors examining the plaintiff only for consultation purposes in connection with litigation. See Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042 (1982). However, the trial court, as the fact finder, makes the final decision as to what expert witnesses are most credible. The effect and weight to be given to expert testimony as to damages depends upon the facts underlying the opinion and, also, rests within broad discretion of trier of fact. Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is more critical. Theriot v. Lasseigne, supra. We may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety. Id. We address the issues regarding Mitchell Watson's general damages award first, and follow with a brief discussion regarding his loss of earning capacity.

1. General Damages ($160,000)
The evidence reveals that after the December 29, 1988 accident, six-year-old Mitchell Dale Watson, somewhat disoriented and combative, was admitted to the Pediatric Intensive Care Unit. He sustained trauma to his face and laceration of the right upper eyelid. X-rays of the body organs and cervical spine were normal. At the time of his release from the hospital on January 16, 1989, Mitchell's neurosurgeon noted a mild paralysis of the right side of his body which he attributed to a hematoma.
During Mitchell's subsequent visit, Dr. Bermudez noted that the small hemorrhage was resolved and Mitchell seemed to be improving. After Mitchell's grandmother expressed concern over Mitchell's learning disabilities on May 30, 1989, Dr. Bermudez determined that these problems pre-dated the accident and stemmed from a dysfunctional home rather than the accident. He referred Mitchell to a psychologist. Shortly thereafter, Dr. Bermudez was informed by letter that Mitchell's family desired to discontinue treatment. Mitchell was thereafter seen by various physicians and psychologists.
The trial court found that Mitchell's pre-accident I.Q. was only slightly higher than his post-accident I.Q., his hematoma was resolved in four and one-half weeks, he has a possible rather than proven seizure disorder, and he does not require future institutionalization. After a review of the record and the trial court's findings, we cannot say that the trial court abused its discretion in its general damage award of $160,000 to Mitchell. This assignment of error is meritless.

2. Loss of Earning Capacity ($60,000)
The trial court determined that Mitchell's pre-accident I.Q. was somewhat higher than his present I.Q., but did not approach the I.Q. of 130 contended by the plaintiffs. The trial court also noted:
Mitchell's mother had disabilities which caused her to have very limited employment options. His half-sister had experienced learning difficulties, and his half-brother had scattered scholastic abilities. Additionally, his father, employed in the field of industrial x-ray, possessed skills primarily learned through on-the-job training and repetition.
Furthermore, the trial court determined that Mitchell's potential for gaining and performing employment, chiefly in semi-skilled jobs, did not diminish because of his injuries. The significance of Mitchell's post-accident I.Q. and possible seizure disorder is its impact on his ability to hold a job over a long period of time. The aforementioned factors support an award for loss of earning capacity.
The Louisiana Supreme Court has gravitated to the nebulous concept of loss of earning capacity, and little evidence is required to trigger the application of the discretion of the trial court, now so vast that there is little room for adjustment on the appellate level. Otnott v. Morgan, 636 So.2d 957 (La.App. 4th Cir.1994). Some of the factors to be considered in determining loss of future income include plaintiff's physical condition before and after his injuries; his age and life expectancy, prior to and after the accident; the amount plaintiff probably would have earned absent the injuries; the probability he would have continued to earn wages over the balance of his life. Laing v. American Honda Motor Company, Inc., 628 *836 So.2d 196 (La.App.2d Cir.1993), writ denied, 94-0375 (La. 3/25/94), 635 So.2d 239 (citing Anderson v. Bennett Wood Fabricators, 571 So.2d 780 (La.App. Cir.1990), writ denied, 573 So.2d 1135 (La.1991)).
Awards for lost income are speculative and cannot be calculated with absolute certainty. Robinson v. Graves, 343 So.2d 147 (La.1977). The trial court must be accorded broad discretion in assessing them, but there must be a factual basis in the record for the award. Starnes v. Caddo Parish School Board, 598 So.2d 472 (La. App.2d Cir.1992).
The fundamental inquiry in claims of loss of earning capacity is whether the plaintiff is disabled from doing work for which he or she is fitted by training and experience. Miller v. Ouachita Parish Police Jury, 550 So.2d 904 (La.App.2d Cir.1989) (citing Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App.2d Cir.1984). Loss of earning capacity can be determined by subtracting plaintiff's earning ability after the injury from his earning ability immediately prior to the injury; the focus is not on actual earnings per se. Berthelot v. Aetna Casualty and Surety Company, 623 So.2d 14 (La.App. 1st Cir.1993).
We find no error with the trial court's award of $60,000 for the loss of Mitchell's earning capacity. He was six-years-old at the time of the accident. We agree with the trial court that "the frequency of Mitchell's future job changes attributable to accident related factors cannot be accurately predicted [and] the period during which he may remain unemployed between jobs cannot be determined." The child, who has slight post-accident disabilities, was so young at the time of the accident. His employment future cannot be accurately predicted. In light of our review of the record, including evidence pertaining to the injuries suffered by Mitchell, we recognize the trial judge's vast discretion and cannot in this instance say that the trial judge abused his discretion. This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER 9

Wrongful Death Awards
Plaintiffs contend that the trial court erred in awarding insufficient wrongful death awards for the death of the three minor plaintiffs' mother, Deborah Watson. The trial court awarded the following: Chad Rowton ($130,000); Tonya Kay Thompson ($140,000); and Mitchell Dale Watson ($150,000).
Wrongful death awards may be based on the degree of affection with the deceased, the amount of guidance needed by the minor, and the closeness of the family relationship. Sledge v. Continental Cas. Co., 25,770 (La.App.2d Cir. 6/24/94), 639 So.2d 805. In the instant case, the wrongful death awards reflect the trauma of losing a parent, and loss of love and guidance. The record reflects that Deborah Watson's children loved her and suffered great pain as a result of her death. The three children dealt with their pain in different ways. The evidence shows that Mitchell had the roughest time coping with his mother's death. Given the evidence, the amounts awarded and the trial court's vast discretion in putting a value on loss of a loved one, we cannot say that the wrongful death awards are insufficient. This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER 10

Legal Interest
The plaintiffs contend the trial court erred in failing to award the minor plaintiffs' legal interest from the date of judicial demand. LSA-R.S. 13:4203 provides:
Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, "ex delicto", which may be rendered by any of the courts.
The award of legal interest in tort cases is not discretionary. Dufrene v. Duncan, 93-0403 (La.App. 1st Cir. 3/11/94), 634 So.2d 19. Legal interest automatically attaches from the date of judicial demand, whether or not prayed for or mentioned in the judgment itself. Id. However, prejudgment interest cannot be awarded on future damages, whether economic or noneconomic. *837 O'Bryan v. Folk Construction. Co., 594 So.2d 900 (La.App. 4th Cir.1991), judgment amended on rehearing. Thus, the judgment is modified to include legal interest in accordance with the law.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to award indemnification to the City of Monroe by the State, and to award legal interest to plaintiffs from the date of judicial demand. In all other respects, the judgment of the trial court is affirmed.
Accordingly the judgment is AFFIRMED IN PART, AMENDED IN PART AND AFFIRMED AS AMENDED.
HIGHTOWER, Judge, concurring in part and dissenting in part.
As for most of the assignments of error before us, I wholeheartedly join in the majority's legal analysis and resolution.
With respect to the three general damage awards, however, I conclude that the trial court abused its discretion by granting monetary sums exceeding those which a reasonable fact-trier could assess. Accordingly, to that extent, I respectfully dissent.