444 So.2d 1372 (1984)
James H. JONES, Plaintiff-Appellant,
v.
P.K. SMITH CHEVROLET-OLDS, INC., et al., Defendants-Appellees.
David THOMPSON, Plaintiff-Appellant,
v.
P.K. SMITH CHEVROLET-OLDS, INC., et al., Defendants-Appellees.
Nos. 15941-CA, 15942-CA.
Court of Appeal of Louisiana, Second Circuit.
January 16, 1984.
*1374 McKeithen, Wear, Ryland & Woodard by Russell A. Woodard, Columbia, for plaintiffs-appellants.
Gist, Methvin, Hughes & Munsterman by Howard B. Gist, Jr., Alexandria, for appellee.
Before MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
FRED W. JONES, Jr., Judge.
In these consolidated suits, plaintiffs appealed a judgment rejecting their demands against General Motors Corporation ("GM") for damages allegedly sustained as the result of an explosion which occurred when a 16" tire was mounted on a 16½'" GM rim. Specified as error was the trial judge's conclusion that the accident was due to plaintiffs' negligence.
For the reasons hereinafter explained, we reverse and render judgment in favor of plaintiffs.
Factual Context
On December 19, 1977 Womack, transported by his father-in-law, Grantadams, visited and purchased from Perry Smith Ford Company ("Smith Ford") in Montgomery, Winn Parish, a used 1976 three-quarter ton Chevrolet pickup truck. Since the vehicle did not have a spare wheel and tire, as part of the sales transaction the vendor agreed to arrange for and furnish those items. Pursuant thereto, telephone calls were made to P.K. Smith Chevrolet-Oldsmobile, Inc. ("Smith Chevrolet"), owned by the vendor's father, and Delta Tire and Supply Company ("Delta Tire"), both in Winnfield.
In order to save time, Womack dispatched Grantadams to pick up the rim from Smith Chevrolet. Upon his arrival at that business establishment, the parts manager, Stevenson, placed a 16½" rim or wheel in the back of Grantadams' truck. Grantadams then went to meet Womack at Delta Tire. At the tire store Womack had bought two new 16" Firestone tires, one of which was to replace a tire on the front of the recently purchased pickup truck and the other to go on the rim as a spare. When Grantadams arrived, Womack removed the rim and placed it with the two new tires in the back of his vehicle. Womack then proceeded to the Eastside Texaco Service Station in Winnfield, owned by James Jones, to have the tires mounted.
When Womack reached the service station and gave instructions concerning the work to be done, David Thompson [Jones' son-in-law and station employee] began to assemble the spare by bolting the rim furnished by Womack on a tire rack. Using a tire tool, Thompson then placed the tire and tube on the rim. Next, the assembled spare was removed from the rack in order to inject air into the tire. While Jones, who had just come out to help, stood with his left foot on the rim, Thompson put about 38 pounds of air into the tire. Jones told him to add a little more air. When Thompson *1375 placed the air hose back on the air stem an explosion occurred, injuring both Jones and Thompson. This litigation ensued.
Procedural Posture
In separate actions, Jones and Thompson sued GM, Smith Ford, Smith Chevrolet, Firestone Tire and Rubber Company ("Firestone"), Delta Tire, and James Womack for damages. The two suits were consolidated for trial purposes.
As the result of the sustaining of a Motion for Summary Judgment, Firestone and Delta Tire were dismissed as defendants. Plaintiffs later settled their claims against Smith Ford and Smith Chevrolet, executed restricted releases, and dismissed those two as defendants, leaving only GM and Womack. GM filed an amended answer setting forth the described releases and dismissal of the two defendants, asserted their negligence, and, in the event of a finding of liability on the part of GM, asked for a credit of at least two-thirds of any sum for which it was cast.
Trial as to GM and Womack was had in January 1982. In written reasons for judgment the trial judge concluded that the described accident was due solely to the negligence of the plaintiffs. Specifically, he found that Thompson was negligent in: failing to determine that the tire matched the rim before mounting; failing to cage or chain down the tire and rim before inflating the tire. The negligence of Jones consisted of: going into the business of mounting light truck tires without learning basic safety procedures; failing to teach his employee, Thompson, necessary safety procedures for mounting tires; allowing Thompson to mount a tire on a rim before determining that the two matched; failing to require Thompson to cage or chain down a truck tire before inflating the tire; placing his foot on the uncaged and unchained tire while it was being inflated.
Judgment was signed on January 21, 1983, in accordance with the written opinion, rejecting plaintiffs' demands against GM. No mention was made of Womack and plaintiffs make no complaint of this omission.
Plaintiffs' primary contention on appeal is that GM was liable to them because of its (1) failure to warn of the extreme exposure to physical injury presented by attempting to mount a 16" tire on a 16½" rim, and, alternatively, (2) failure to legibly mark the rim as to size.
GM argues first, as an evidentiary matter, that plaintiffs failed to prove it was the distributor of the rim in question or that the rim introduced at the trial was in fact the rim involved in the accident. As to the substantive law, GM asserts that (1) it was under no duty to warn plaintiff of the danger of mounting a 16" tire on a 16½" rim because the two were experienced tiremen who admittedly knew of that danger and (2) if GM was in any way negligent, plaintiffs' claims were barred by their contributory negligence or victim fault in not leaving the tire bolted down until it was fully inflated.
Evidentiary Matters
Stevenson, veteran parts manager for Smith Chevrolet, testified that on the date of the accident he received a telephone call from Perry Smith requesting a rim for a 1976 3/4-ton Chevrolet pickup truck. Nothing was said as to rim size. Aware that the described truck used a variety of rims, including 15", 16" and 16½", Stevenson secured a 16½" rim which he had removed from a new Chevrolet pickup truck they had in stock. This was the only kind of new truck the dealership handled. Upon the arrival of Grantadams, that rim was placed in his truck. Again, according to Stevenson, nothing was said as to rim size.
This rim, of course, was delivered by Grantadams to Womack who, in turn, left it at Jones' service station for mounting of the tire.
Visiting the service station soon after the explosion, Womack saw Jones and Thompson being taken away in an ambulance. Nothing in the station had apparently been moved or cleaned up. Observing his new rim with a tire hanging on it, Womack took the items to a Conoco service station in Winnfield for completion of the assembly. However, when a dent was discovered in *1376 the rim lip, Womack returned the rim to Smith Chevrolet.
Two or three weeks following the accident, Jones sent an employee, Myrick, to Smith Chevrolet to bring back the rim in question. Stevenson testified that he handed Myrick the 16½" rim which he had previously placed in Grantadams' truck and which was later returned by Womack. Myrick left the rim in Jones' service station.
The rim introduced at the trial was identified by several parties, including the plaintiffs, as being similar to the one involved in the accident.
GM argues that its rims are always painted black, in contrast to the white rim identified as that delivered by Stevenson. It also points out that the invoice completed by Stevenson described the rim transferred by him as being 16".
As to the invoice, Stevenson explained that he mistakenly marked the rim as 16" by simply getting on the wrong linethe line for a 16½" rim was immediately under that for a 16" rim. The parts manager also testified that the rim had 16.5 X 6.00 stamped on the inside, although the "1" was very dim. Stevenson was positive that the rim was removed from a new Chevrolet pickup truck.
Although there is no specific finding of fact by the trial judge on this question, he at least impliedly concluded that the rim involved in this accident was distributed by GM and that the rim introduced at the trial was the same item involved in the accident. There is ample evidence in the record to support this conclusion, which we make expressly. We further note that there is a slight dent or crimp in an outside lip of this rim, which is consistent with Womack's description of the rim which he secured from Jones' service station following the accident.
Despite the fact that GM did not manufacture the rim, its responsibility as a professional vendor of the rim is the same as that of the manufacturer. Chappuis v. Sears Roebuck & Company, 358 So.2d 926 (La.1978).
Duty to Warn
Though a product contains no defect per se, a manufacturer must give warning of any danger inherent in the product's normal use which is not within the knowledge of an ordinary user. Hebert v. Brazzel, 403 So.2d 1242 (La.1981).
Plaintiffs contend that, although both stated they knew better than to try to mount a mismatched tire and rim, there was no evidence that the extreme exposure to physical injury which was presented by mounting a 16" tire on a 16½" rim was known to the plaintiffs.
Defendant argues, on the other hand, that it was under no legal duty to warn a party, particularly an experienced professional, such as each plaintiff, of that of which he was already awarei.e., the danger of trying to mount a 16" tire on a 16½" rim.
The 50 year old Jones testified that he had been operating the service station about 16 months when the accident occurred. He knew better than to try mounting a smaller tire on a larger rim. Jones could usually tell there was a mismatch if the tire was too loose or too tight on the rim.
The 23 year old Thompson had been working at the service station some seven or eight months prior to the accident. On an average he mounted 12-14 tires a day. Thompson also knew of the danger involved in attempting to mount a mismatched tire and rim. However, in this case since the tire went on the wheel without any difficulty, he did not examine the wheel to see what size it was. Thompson said that he removed the tire from the tire rack to air it up so that they could begin to mount another tire.
It appears clear to us from the record that the danger of attempting to mount a 16" tire on a 16½" rim was obvious to both plaintiffs. Consequently, GM was under no duty to place a warning to that effect on the rim to advise these plaintiffs of what they already knew.
*1377 Duty to Give Reasonable Notice of Rim Size
In this case the marking as to rim size was stamped or imprinted on the inside of the rim; was the same color as the rim itself; showed "16.5 X 6.00", with the "1" before the "6" barely distinguishable; the numbers were approximately 1/8 inch high and the entire imprinting about 3/4 inch long.
Plaintiffs argue that GM was under a legal duty to legibly mark this rim as to size because: defendant knew that tires and rims would be changed from time to time; this was the only mismatch which would cause an explosion of this nature, since in other mismatches the tire would either not fit over the rim or the tire would not hold air; the 16" rim is actually taller than the 16½" rim. Plaintiffs further assert that information as to size of the rim should have been so placed that one attempting to match a tire and rim was given reasonable notice of the rim size.
We agree with plaintiffs' argument on this point. In the recent case of Andries v. General Motors Corporation, 444 So.2d 1180 (La.1983), addressing the duty to warn [which it found had not been violated] our state supreme court noted:
"Proper placement of a warning label so that it is clearly visible is one factor to be considered in determining the adequacy of the warning in a products liability case. A warning label which is not clearly visible is not an adequate warning."
Although we have held that GM was under no duty to warn plaintiffs of the danger of trying to mount a 16" tire on a 16½" rim, it should have marked the rim as to size in a reasonable manner. After all, it does little good to know of the danger of mismatching if the party assembling the tire and rim is not given fair notice of the rim size. Stevenson, who had worked with motor vehicle parts for more than 25 years, testified that he could not tell the difference between a 16" and a 16½" rim without measuring the two. A GM representative conceded that he could find the size imprinted on this rim only because of his knowledge of the specific point at which rims are marked during the manufacturing process.
We find that GM had a legal duty to reasonably mark this rim as to size and that it breached this duty by the manner in which it attempted to mark the rim. Was this breach a legal cause of the accident i.e., should GM have anticipated this particular consequence of its failure to properly mark the rim as to size? Of course, this includes all of the acts of plaintiffs which GM and the trial judge have characterized as negligence or victim fault, particularly removal of the wheel assembly from the tire rack before completion of the airing.
In view of the likelihood that rims and tires would be changed and considering the ease with which a 16" tire goes on a 16½" rim, we find that GM should have anticipated this kind of occurrence. Consequently, its failure to properly label the rim as to size was a legal cause of the accident. In attempting to mount the tire on the rim, nothing untoward would take place tending to alert plaintiffs that the rim was larger than the tire and that a final airing without bolting down the wheel assembly entailed any danger. In summary, applying the duty/risk analysis, we have determined that GM owed a duty to these plaintiffs to properly label the rim as to size; that duty was breached; the breach was a legal cause of the accident. Therefore, GM is liable to plaintiffs for their damages.
Quantum
We are empowered to award damages in cases where the trial court initially rejects plaintiffs' demands and the record is complete with regard to damages. La.C. C.P. Art. 2164; Holman v. Reliance Insurance Companies, 414 So.2d 1298, 1310 (La. App. 2d Cir.1982).
Assessing general damages at the appellate level, we are not obliged to make an award equal to either the highest or lowest dollar amount, as in the review of trial court judgments. Our mandate is to fix damage awards, based upon record evidence, that are just and fair. Wall v. *1378 American Employers Ins. Co., 377 So.2d 369 (La.App. 2d Cir.1979).
With these principles in mind, we turn to the injuries sustained by these plaintiffs.
Jones
Following the accident, this plaintiff was taken to the emergency room of the Winnfield General Hospital. Because of the severity of his wounds, which obviously required the attention of a specialist, Jones was immediately transferred to an Alexandria hospital. After an extensive examination, Dr. Beurlot, an orthopedic surgeon, found that Jones had suffered a comminuted fracture of the left heel bone, fractures of two other bones in the left foot, a puncture wound to the left thigh, and some derangement of the left knee. The patient was hospitalized until December 24, 1977, when he was discharged from the Alexandria hospital, fitted with a cast coming up above the left knee. Upon returning home Jones used a wheelchair for from four to six weeks.
Because of continued discomfort in the left foot, Jones consulted physicians at the Veterans Hospital in Shreveport in the latter part of February 1978. After having been fitted with a brace at that institution in May 1978, he was able to place some weight on the left foot for the first time since the accident. Jones used the brace and a cane to assist in walking until the end of 1978.
With the reduction of swelling in his left foot, in January 1979 Jones was operated upon at the VA Hospital. This operative procedure involved fusion of three bones in the left ankle area so that the patient's foot could not move from side to side, thereby stabilizing the weakened left ankle. Plaintiff was discharged after remaining in the hospital about a week. He left the institution on crutches, with a cast on his left leg and foot. When the cast was removed on March 1, 1979, the left ankle was discovered to be infected in the vicinity of the incision. Jones was readmitted to the hospital and treated for the infection. The latter was cleared up in two weeks and plaintiff again discharged. He continued returning to the VA Hospital at regular intervals through the end of 1980.
Dr. Beurlot last examined Jones on August 27, 1981, and found that plaintiff still complained of pain in his left ankle. Dr. Beurlot concluded that Jones was incapable of prolonged standing or walking. He stated that Jones could perform many of the duties required around a service station, but could not execute these tasks on a repetitive basis. His assessment of Jones' lower left extremity impairment was 9%.
Dr. Rambach, another orthopedic surgeon, saw Jones for the purpose of assessing his disability on July 30, 1978. This physician found some swelling of the left foot and limited motion of the ankle resulting from the fusion operation. He concluded that Jones had reached his maximum level of improvement and that the condition of his left lower extremity would prevent the performance of any heavy manual labor.
Dr. Bettinger, expert witness, estimated that Jones had sustained past income losses of $46,173. He further testified that, even were Jones to start a new career at minimum wages, his future income loss would amount to $112,448.
Considering the severity of Jones' wounds, we have determined that a fair award for his general damages is $50,000. Recognizing that this plaintiff has actually lost several years income, but aware of the speculative nature of his future earning capacity loss, we fix his award for past and future income or earning capacity loss at $120,000.
Thompson
This plaintiff was also examined by Dr. Beurlot in Alexandria soon after the described accident. Thompson was found to have suffered a comminuted fracture of the large bone in the right forearm in the area of the wrist joint where the wrist begins to move. Plaintiff was operated upon on December 23, 1977, at which time pins were placed in his right wrist and a cast applied. He was discharged after *1379 spending several days in the hospital. The fracture healed properly within about one month, whereupon the cast was removed and the pins taken out. Thompson resumed employment as an oil field worker in February 1978.
Dr. Beurlot last examined Thompson in August 1981 and assigned to his patient's right wrist a permanent impairment of 10%. Dr. Rambach saw Thompson to assess his disability in July 1981, and fixed the right wrist disability at 15%.
Based upon the record evidence of his injury, we fix the general damage award to Thompson at $15,000, and conclude that he has sustained $3,500 lost income. Although there is some evidence that his employment opportunities in the future may be somewhat restricted because of the wrist injury, that evidence is not substantial enough to justify an award for future income or earning capacity loss.
Credit for Settlements
As we have pointed out, after filing of these suits both plaintiffs settled with and released defendants Smith Ford and Smith Chevrolet, having originally sued these parties as alleged joint tortfeasors.
In Wall v. American Employers Ins. Co., 386 So.2d 79 (La.1980) the state supreme court found that we erred in determining that plaintiffs were bound by allegations of an original petition concerning joint tortfeasors, pointing out that those pleadings had been amended by implied consent of the parties to charge exclusive fault on the part of the police jury. However, the court then proceeded to explain that reduction of the award would nonetheless be warranted if evidence presented at the trial indicated the two released drivers were in fact negligent and thus joint tortfeasors with the police jurywhich the record was found to show.
Here there was no implied consent of the parties to charge exclusive negligence on the part of GM. In fact, after dismissal of the suits against Smith Ford and Smith Chevrolet, GM amended its answer to reiterate the negligence of those parties and ask for proper credit on any judgment rendered against it. Be that as it may, the record fully supports a conclusion of joint negligence on the part of the two released defendants. Consequently, GM is entitled to a credit on the judgment rendered herein against it for two-thirds, since two of the three joint tortfeasors have been released.
Decree
For the reasons set forth above, the judgment of the district court is reversed, and there will be judgment against General Motors Corporation and in favor of James H. Jones for the sum of $170,000 and in favor of the plaintiff David Thompson for the sum of $18,500, both bearing legal interest from judicial demand until paid, and for cost of court, subject to these amounts to each plaintiff being reduced by two-thirds at the time said judgments are paid. Costs of appeal are assessed to General Motors Corporation.