688 So.2d 1082 (1996)
Pamela ODOM, et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, DEPT. OF TRANSPORTATION AND DEVELOPMENT, et al., Defendants-Appellees.
No. 95-1605.
Court of Appeal of Louisiana, Third Circuit.
September 25, 1996.
Writ Denied January 24, 1997.
*1083 J.J. McKernan, Baton Rouge, for Pamela Odom, et al.
Paul Boudreaux, Jr., Alexandria, for State of Louisiana through DOTD.
Before WOODARD, PETERS and SULLIVAN, JJ.
WOODARD, Judge.
In this wrongful death action against Department of Transportation and Development (DOTD), appellant brought suit claiming that negligent construction and maintenance of the roadway and shoulder caused the death of her spouse. The trial court entered judgment finding no fault on the part of DOTD. We reverse.

FACTS
On February 16, 1986, Clarence Odom died as a result of a one-vehicle accident that occurred on Louisiana Highway 399 in Vernon Parish. Highway 399 is a two-lane asphalt road with non-paved shoulders. It runs approximately 7 to 8 miles north and south, connecting Louisiana Highway 10 to Louisiana Highway 112. It has a posted speed limit of 55 miles per hour. Odom was traveling south in a three-axle 1982 Ford F700 truck. The truck was owned by Odom's employer and had a pulpwood body and rear tandems. At the time of the accident, the truck was loaded with 6-8 inch pine pulpwood, which Odom was in the process of *1084 delivering to Boise Cascade in DeRidder, Louisiana.
According to the investigating officer, Trooper George Elliot of the Louisiana State Police, the accident occurred at approximately 11:40 a.m. on a clear, dry day 2.6 miles south of LA 10. Investigation of the scene revealed that, for reasons unknown, the truck's right wheels moved from the paved portion of the road onto the shoulder area for a distance of 242 feet, 8 inches, while moving at the rate OF approximately 42-45 miles an hour. After traveling this distance, Odom's vehicle returned to the paved surface and overturned onto its right side, sliding approximately 91 feet, 8 inches before completely overturning. The vehicle came to rest in a ditch located 15 feet from the center line of the highway. Odom was ejected from the vehicle and was found dead at the scene.
Pamela Odom, Odom's wife, brought suit, on behalf of herself and their minor child, Christopher, for the wrongful death of her husband against the State of Louisiana, through the Department of Transportation and Development. The petition alleged that the State failed to properly construct and maintain the roadway and shoulders of LA 399 and that the failure contributed to the accident. The DOTD asserted that it was not the condition of the roadway and shoulders, but a combination of driver error and the shifting of the pulpwood load, that caused the accident.
The matter was heard before the Honorable Roy B. Tuck, Jr. of the Thirtieth Judicial District Court in Leesville, Louisiana, in a bench trial presented on April 19 and 20, 1989. Both sides presented evidence from experts in highway design and accident reconstruction, photographs and detailed diagrams of the accident scene, documentary evidence, and depositions from several witnesses.
On August 7, 1995, more than 6 years from the date of trial, written reasons for judgment were presented. On September 6, 1995, the trial court found for the defendant, State of Louisiana, through DOTD, stating that they were not negligent and not at fault for the February 16, 1986 accident. Plaintiff timely filed her petition for devolutive appeal on September 28, 1995.

ASSIGNMENT OF ERROR
Plaintiff asserts that the trial court erred in failing to assess the State of Louisiana, through the Department of Transportation and Development, with any liability in this matter as such a decision is contrary to the law and facts presented at trial. Specifically, Plaintiff presents two issues for review:
(1) Whether the trial court erred in failing to find that the roadway and shoulders of Louisiana Highway 399 were negligently constructed and/or maintained at the time of the accident, and
(2) [w]hether the trial court erred in failing to find that defects in the roadway and shoulders of Louisiana Highway 399 were a cause-in-fact and legal cause of the accident.

STANDARD OF REVIEW
It is well settled that an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). From this standard, the Louisiana Supreme Court has established a two-tier test for reversal on appellate review:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Id. at 882 (citation omitted). Even when an appellate court may feel that its own evaluations are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). These principles are based on the trial court's better capacity to evaluate live witnesses and upon the proper allocation of trial and appellate functions between the respective courts. Stobart, 617 So.2d at 880 [quoting Canter v. Koehring Co., 283 *1085 So.2d 716, 724 (La.1973)]. Thus, an appellate court must do more than simply review the record for some evidence which supports or controverts the trial court's findings, it must review the record in its entirety to determine whether the decision reached was manifestly erroneous. Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Law v. City of Eunice, 94-1312 (La. App. 3 Cir. 4/5/95); 653 So.2d 149. While the trial court is in a better position to evaluate and assess the credibility of witnesses, the overriding determination for the court of appeal is whether these determinations are reasonable. "Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Rosell, 549 So.2d at 844-45.

LAW
Liability of a state entity, such as DOTD, may arise under a theory of negligence, La.Civ.Code art. 2315, or a theory of strict liability, La.Civ.Code art. 2317. La. R.S. 9:2800, as applied to government defendants, requires a plaintiff to prove that the public entity had "actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so." Therefore, analysis of liability for a public entity is the same, whether under a theory of negligence or strict liability.
In determining whether liability exists under either theory, the plaintiff has the burden of proving that: (1) The property which caused damage was in the custody of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm (breach of the duty); (3) that the defendant had actual or constructive knowledge of the risk; and (4) that the defect was cause in fact and legal cause of the resulting injury. Campbell v. Dep't of Transp. & Dev., 94-1052 (La. 1/17/95); 648 So.2d 898; Miller v. Evangeline Parish Police Jury, 95-566 (La.App. 3 Cir. 10/11/95) 663 So.2d 398.
CONSTRUCTION AND MAINTENANCE OF HIGHWAY 399
Plaintiff asserts that the trial court erred in failing to find that the roadway and shoulder of LA 399 were negligently constructed and/or maintained at the time of the accident. DOTD has a duty to maintain its highways and shoulders in a reasonably safe condition. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986); Campbell, 648 So.2d 898. The shoulder is that area of the roadway immediately adjacent, and connected to, the paved portion of the roadway. One of the purposes of a shoulder is to provide a margin of error for the safety of motorists. LeBlanc v. State. 419 So.2d 853 (La.1982) The supreme court has held that a motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Id. Conversely, the Highway Department's duty to maintain a safe shoulder encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder. Id. Therefore, a highway without a shoulder or one which never permits safe deviation from the main traffic lanes would be intolerably unsafe. Id.
Notwithstanding, the failure of DOTD to reconstruct the state's highways to meet modern standards does not, of itself, establish the existence of a hazardous defect. Manasco v. Poplus, 530 So.2d 548 (La.1988). "Whether DOTD breached its duty, that is, whether the roadway and shoulders at the scene of the accident were in an unreasonably dangerous condition, will depend on the particular facts and circumstances of each case." Myers, 493 So.2d at 1172.
*1086 Mr. James Clary, a consulting civil engineer, testified as an expert witness on behalf of Ms. Odom. Mr. Clary stated that Highway 399 underwent reconstruction in 1960 to bring the entire roadway up to current standards (upgrading the highway from a gravel road to asphalt). Mr. Clary further stated that those plans called for a cross-slope (amount of drop in elevation from the center line to the edge of the road) of 2¼ inches in 10 feet of highway surface and for shoulders which were 5 feet wide with a drop in elevation of 8 inches at a point 5 feet from the edge of the paved surface. These are not minimum measurements, but rather measurements which are not to be exceeded. Almost two years after the accident, Mr. Clary made measurements of the road and shoulders at the location of the accident and platted his findings, which were undisputed by DOTD. Evidence also established that the condition of the road at the time of this survey was substantially the same as at the time of the accident. He testified that at the point where Odom's vehicle left the roadway the right edge of the southbound lane was 8 inches lower than the center of the road. This slope is 3½ times steeper than called for in the highway department's own plans and specifications. He further testified that the DOTD plans called for the first foot of the shoulder (the point where the pavement stops) to be flat with no slope and that there be a drop of no more than 8 inches in the remaining 4 feet of shoulder. Measuring out from the beginning of the shoulder, Mr. Clary found a 4 inch drop within the first foot of the shoulder which sloped down to an 8½ inch drop in the first 2 feet. At the point where the shoulder was designed to end, 5 feet, the drop was 20 inches, twice as much as was called for in the DOTD plans. In its Written Reasons for Judgment, the trial court stated that Mr. Clary "apparently did not measure [the] width to the point where [the] shoulder obviously sloped into the ditch." According to Mr. Clary's testimony, he based his measurements of shoulder width on the requirement of a maximum slope of 8 inches. Since the shoulder is supposed to slope only 8 inches, Mr. Clary considered the shoulder to end when a drop of 8 inches was reached.
While DOTD did not refute Mr. Clary's findings, Mr. William Hickey, a road design engineer for DOTD, testified for DOTD that the shoulder was actually 5 feet in width, although somewhat misshapen and slightly steeper than when originally constructed. This disagreement over the actual width of the shoulder, as noted by the trial court, apparently stems from disagreement over what measurements are to be used in determining the width of the shoulder. Under Mr. Clary's definition, the shoulder is only 3-5 feet, 2 feet narrower than called for in the DOTD specifications. Under Mr. Hickey's definition, the shoulder's width is 5 feet and includes a drop in elevation of 20 inches. This drop in elevation is more than twice as steep as that called for in the DOTD plans. Thus, under either definition, the shoulder of Highway 399 did not conform to the specifications issued by DOTD, either at the time of construction or the time of the accident. Furthermore, Mr. Clary testified that while the overall width of the paved portion of the road exceeded the DOTD specifications by ½ foot, the actual width of the southbound lane (the lane Odom was traveling on) was 9 feet, 4 inches, 4 inches narrower than the required 10 feet. None of these measurements were controverted by DOTD. In addition to the excessive slope of the shoulder, Ms. Odom maintains that the roadway and shoulder were improperly maintained.
Mr. Dale Moore, an accident reconstructionist, testified as an expert witness on behalf of Ms. Odom. Based upon the accident report, photographs, and visits to the site, Mr. Moore concluded that at a point approximately 200 feet from where the right wheels of the vehicle left the road, the truck began to rotate in a counter-clockwise motion due to the excessive slope. At this point, he opined, the shoulder gave way and enough dirt built up around the wheel, causing the truck to "trip" on the buildup of dirt and overturn. Ms. Odom presented photographs of the accident scene, taken almost two years later, to establish that the shoulder was not compacted and that the edge of the roadway was crumbling causing the truck to leave the road and eventually overturn. Contradictory evidence, however, was presented by DOTD *1087 that the roadway was not in need of repair at the time of the accident and that the shoulder was tightly compacted.
Where testimony is contradictory, a trial court's determinations of fact will not be overturned unless they are unreasonable. Stobart, 617 So.2d 880. While there existed contradictory evidence as to the composition and stability of the shoulder, Mr. Clary's testimony as to the excessive cross-slope of the roadway and the shoulder were uncontroverted. The evidence showed that the cross-slope of the roadway and the shoulder was more than twice that allowed under DOTD standards. Under La.R.S. 48:35, the DOTD shall conform as far as possible to the minimum safety standards promulgated by the American Association of State Highway and Transportation Officials (AASHTO) with respect to highway and bridge design, construction, and maintenance. Williams v. City of Monroe, 27,065, 27,066 (La.App. 2 Cir. 7/3/95) 658 So.2d 820. The court in Williams held that the verb "shall" indicates that DOTD is mandated to meet such standards, except when it is impossible. Id. No evidence was presented by DOTD to show that, at the time of the 1960 upgrade, meeting the AASHTO standards was "impossible." While a trier of fact has wide discretion in assessing the credibility and weight to be given to testimony, its decision must still be based on testimony grounded in fact. Therefore, it was unreasonable and manifest error for the trial court to find that DOTD did not breach its duty to construct and maintain its shoulders in a reasonably safe condition.
Furthermore, DOTD had knowledge of the defective condition of the shoulder in two respects. First, when the roadway was upgraded in 1960, it did not conform to either the AASHTO standards, or to DOTD's own specifications and plans for the highway itself. Second, Oliver Perkins, the Parish Maintenance Superintendent for Vernon Parish, testified that he travels the roads of Vernon Parish "constantly," and had driven Highway 399 two weeks prior to Odom's accident. In addition, Mr. Perkins testified that he saw log trucks on the road all the time and stated that "they are tearing the road up." This testimony establishes that DOTD had not only constructive knowledge of the roadway but also actual knowledge as to the condition of the paved portion being jagged. Mr. Perkins' testimony also refutes DOTD's assertion that the roadway was not in need of repair at the time of the accident.
For the above reasons, it was error for the trial court to find that DOTD was not negligent in its construction and maintenance of Highway 399 and that DOTD had no knowledge of the defect.
CAUSE IN FACT AND LEGAL CAUSE OF THE ACCIDENT
Plaintiff's second assertion is that the trial court erred in failing to find that defects in the roadway and shoulders of Highway 399 were a cause in fact and legal cause of the accident. Even though the trial court erred in not finding Highway 399 defective, plaintiff must still prove by a preponderance of the evidence that these defects were cause in fact and legal cause of Odom's accident. The trial court, in its Written Reasons for Judgment stated:
If the accident and resulting injuries would not have occurred "but for" the negligence, defect or fault under consideration, such fault is deemed a cause in fact of the accident. Conversely, if the accident would have occurred irrespective of the negligence, defect or fault under consideration, such fault is deemed not to be a cause in fact of the accident.
In the case sub judice, the all-important question is: Does a preponderance of the evidence establish that, "but for" dangerous conditions existing in the highway and its adjacent shoulder, this accident and death would not have occurred?
The trial court then goes on to state that "Mr. Moore could not answer the query. When asked almost the identical question he responded that he didn't know which may be fairly interpreted to mean that he had no strong professional opinion." However, the record shows the following:
Q. Are you prepared, sir, at this time to give an opinion as to whether at the time of this accident, but for the condition of the roadway and its adjacent *1088 shoulder, this accident would not have occurred?
A. I don't know whether it would have occurred or not, it's very probable had he hadif he didn't have to contend with such a steep crown in the roadway, such a steep incline on the shoulder of the roadway and such a narrow roadway, I think he would have probably recovered. As I have stated before, even though he had a 2 foot shoulder even in the condition it was in he was nearly back on the roadway when the shoulder gave way. And, had it not given way, it's very likely that he would have regained the roadway.
Clearly, Mr. Moore had a strong professional opinion that the steepness of the roadway and the shoulder was the cause of the accident.
The trial court held that "[t]he process of reasoning by which Mr. Moore arrives at such conclusion is not well-founded." The court based this determination on the testimony of officers at the scene of the accident who stated that they could not recall any holes or crumbling on the edge of the pavement which would have caused Odom to leave the roadway. The court instead relied upon the reasons suggested by Dr. Anthony Galli, a professor of physics and an accident reconstructionist, who testified as an expert witness for DOTD. Based upon his review of photographs, the accident report, visits to the accident site, and other items contained in the file, Dr. Galli concluded that Odom's vehicle leaned and overturned because, while fully in the roadway, its load of pulpwood shifted, causing the truck to overturn. Dr. Galli based his opinion on the fact that:
(1) He found no indication that the wheels slid down the shoulder and the marks on the road indicated that all wheels were on the road prior to the truck turning over;
(2) The scrape marks in the road indicate that the cab portion of the truck was over the center line prior to tipping over;
(3) He found no evidence of dirt or grass on the rear wheel which would be expected if the vehicle "tripped" as suggested by Mr. Moore;
(4) The wheels of the vehicle did not come off the rim, one of the signatures of the kind of roll-over suggested by Mr. Moore;
(5) The scrape marks on the body of the truck run from the front of the truck to the back. Had the truck overturned while its rear wheels were in the ditch the scrape marks would have been more up and down than front to back;
(6) The photographs and the marks on the road indicate that all of the truck's wheels were on the road prior to turning over.
In its Written Reasons for Judgment, the trial court refers to Dr. Galli's testimony that the drop in the shoulder averaged 10.9 degrees over a distance of 5 feet, but that the drop would have been considerably less at a distance of 2 feet from the edge. Dr. Galli further conceded that because of the slope in the shoulder some extra effort would have been required to control the vehicle after the right wheels left the road but was of the opinion that, considering the nature of the terrain over which such trucks operate in the woods, that a shift of 10 degrees in the position of the truck would not have caused the load to shift if it were properly bound. The court further found that, based on the evidence of officers at the scene of the accident, there was no evidence of any defect in the roadway which would have caused Odom's vehicle to leave the roadway.
Dr. Galli's reasoning, and the court's reliance upon it, are flawed for three reasons. First, Dr. Galli's testimony is internally inconsistent. The degree of the slope of the roadway and shoulder is crucial to any determination of whether the roadway and shoulder contributed to the overturning of the vehicle. Dr. Galli's testimony as to the actual degree of slope, however, changes three times during his testimony. His original assertion is that the truck was listing at 10 degrees, then his testimony changes to 18 degrees, as evidenced by this dialogue:
Q. Let's move on `cause we could be here all day, let me ask you this, what I'm *1089 trying to find out, sir, is as a vehicle such as this leaves the road, 2 feet off the road where we admittedly have a slope of 8 inches on the shoulder, 2 feet away, and admittedly we have some slope where there'sit's 6 feet onto the pavement considering it's 8 feet wide, 2 feet off the road, 6 feet on the road, so, you do have some slope, is that correct, from where the right tires are traveling along the shoulder, you do have some slope?
A. There is some slope from the left side to the right side, yes.
Q. And, we know it would at least be 8 inches because it's 8 inches from the edge of the road to 2 feet from the shoulder.
A. Again, I can only work with the angles because I'm dealing with that 10.9 degrees, and ...
Q. Okay. Well, I'd like you just to assume that it's 8 inches?
A. Alright, I will assume that it's 8 inches in 8 feet ...
Q. No, in 2 feet, 8 inches in 2 feet.
A. That's 18 degrees.
Q. Yes sir, okay.
Later in his testimony, Dr. Galli returns to the assertion that the truck was listing at 10 degrees, and finally, on re-direct examination, Dr. Galli asserts that the truck was listing at less than 10 degrees:
Q. We have been talking about 10 degrees, the vehicle riding on the shoulder at 10 degrees, it's my understanding when you calculated the 10 degrees that's when you were looking at the possibility of the truck being 5 feet off the shoulder?
A. That's correct.
Q. Under these conditions on this roadway, if that truck was only 2 feet off the shoulder it would be substantially less than 10 degrees?
A. Yes, it would be.
As we can see, when given the same hypothetical three different times: an 8 foot truck, 6 feet on the road, 2 feet off the road, with a shoulder that drops 8 inches in 2 feet, Dr. Galli gives three different estimations of how many degrees the truck would list to the right. First, he states 10 degrees, then he states 18 degrees, and finally, he states substantially less than 10 degrees. While the trier of fact has wide discretion in evaluating credibility and weight to be given to evidence, an appellate court may overturn such findings if they are internally inconsistent. In this case, the angle at which the truck was listing is crucial to a determination of whether or not the slope of the roadway and shoulder contributed to the accident. A variation as wide as "substantially less than 10 degrees" to 18 degrees is not only internally inconsistent but also calls into question the very basis for this witness's expert opinion.
Second, as can be seen from the above testimony, Dr. Galli's theory of why the truck overturned is unsupported by any facts, as the following dialogue indicates:
Q. Now, just one final thing, you said you think he tipped over because of the load shifting?
A. This was my most likely scenario, yes sir.
Q. Okay. And, did the load shift because of the sudden movement of the truck, is that what caused it, having left the road?
A. I don't know.
Q. Huh?
A. I don't know.
Q. Well, isn't that the most plausible scenario, that the load shifted because he had gone off onto the shoulder and there was that as you have already described is there is the rolling effect where you have, he's on an angle, high center of mass, the right tires are lower than the left tires and you tend to have that rolling effect, isn't that the most plausible reason as to why the load shifted?
A. The load, of course, if it weren't bound properly could shift even while he's driving normally.
Q. Do you have any evidence that it wasn't bound properly?
A. No sir.
. . . .

*1090 Q. The reasons why you think that there may be load shifting other than what I have described to you as the roll over effect, high center of mass and as being the 10 degree slope, any other reason is strictly a possibility, is that correct?
A. Well, I hate to say any other, that's so universal.
Q. Well, if you can be specific I'll be happy to hear it, sir?
A. Yes sir, I thought I was specific that this I felt was the most likely a shifting load and now the cause of the shifting I don't know, okay.
Q. That's what I'm saying, the cause of the shifting you are not certain of, right?
A. That's correct.
Q. But, the most probable cause would be, absent evidence to the contrary that you have and you don't have any, would it not be the fact that he was on the shoulder, that there was a 10 degree slope and that you had this effect, this whereyou have this roll over effect, would that not be the most probable cause of all the ones ...
A. Now, you are talking about the load shifting?
Q. Yes sir.
A. This 10 degrees shouldn't cause that load to shift, it will cause a weight shift which is due to the suspension, in other words the suspension now gives and ungives, now, the actual load shift that I referred to is a movement in layers perhaps of the wood itself, so that type of thing, had it been unbound, thenand you start coming over about 10 degrees it seems possible then that this bouncing and the angle would have contributed to the motion of these things, allowed them to slip.
Q. But, you don't have any evidence that it was unbound, do you?
A. No.
While he opines that the load was improperly bound, he can point to no facts to substantiate his assertion. In fact, when asked if he were "aware of how this type of vehicle ties down its load," he replied, "I really can't say generally but it is my understanding the binding chain is designed so that it would give or break in the event of an incipient tipover, like a load shift." Not only was Dr. Galli unable to offer any evidence to support his theory of load shift but he was not even aware of how this particular truck tied down its load.
In addition to having no evidence that the load was improperly bound or shifted, Dr. Galli testified that he could find no evidence of sliding or instability of the shoulder. However, the area which Dr. Galli investigated was not the area where Mr. Moore believes the truck began to rotate counter-clockwise. From the testimony, it can be seen that Dr. Galli investigated the area where the truck overturned. The area where Mr. Moore believes the shoulder gave way is substantially farther north from the point where the truck actually overturned. Again, Dr. Galli's testimony cannot be credible when it does not have a factual basis.
Finally, and most importantly, the trial court erred in not assigning any fault whatsoever to DOTD. As was stated in the Written Reasons for Judgment, Dr. Galli and Mr. Moore agree on certain facts, namely: (1) Neither felt that the cause of the wheels leaving the road was excessive speed; (2) that the truck was never more than 2 feet off the surface of the road; and (3) that there was no residual evidence to indicate braking by the driver. Furthermore, it was established that no one knows why the truck initially left the road.
In Dr. Galli's opinion, the truck did not turn over until it had returned to the road surface, as can be seen in the following dialogue from his direct examination:
Q. Did you find any additional evidence at the accident scene that you would attribute to this particular accident?
A. To the accidentI didn't hear quite the last part....
Q. Yes sir, the accident.
A. To the accident, I noticed some eroded places in the ditch in the vicinity of the curve sign, these I ascribed to the logs *1091 coming off when the load got dispursed [sic] and gouging out. I also found, at the place that was marked where the truck supposedly left the road I saw an eroded place there left by, you know, a track of a truck, what appeared to be a truck and that eroded and left the mark, in other words, when I say eroded I'm referring to the fact that something left a heavy mark and then with time that mark stays because you get some rain erosion in there and that's where I saw a mark that appeared to have been associated with the accident.
Subsequently, Dr. Galli again states that he believes the truck had regained the roadway before it started dumping its load. From either theory of the accident, then, evidence shows that Odom's truck left the roadway; traveled 242 feet, 8 inches; and returned, or partially returned, to the roadway before overturning. In Mr. Moore's opinion, the shoulder gave way causing the truck to overturn. In Dr. Galli's opinion, the load shifted, causing the truck to overturn once it reentered the highway. In either scenario, the truck was traveling partially on the shoulder and partially on the road, both of which were overly sloped.
LIABILITY OF DOTD
In light of the above observations, we must now consider the trial court's finding of no fault on the part of DOTD. Since we overrule the trial court's assessment of fault on behalf of Odom, we must address the apportionment of fault between Odom and DOTD.
In Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985), the supreme court indicated the factors which may be considered in apportioning fault. These factors include:
(1) [W]hether the conduct resulted from inadvertence or involved an awareness of the danger,
(2) how great a risk was created by the conduct,
(3) the significance of what was sought by the conduct,
(4) the capacities of the actor, whether superior or inferior, and
(5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
Id. at 974.
In applying these factors to the present case, the evidence shows that Odom was not exceeding the posted speed limit at the time the accident occurred and that he traveled 242 feet, 8 inches before attempting to reenter the roadway. The testimony of Mr. Moore supports the view that Mr. Odom operated the vehicle in the manner recommended for professional truck drivers. In fact, it was Mr. Moore's opinion that, but for the slope of the roadway and shoulder, Mr. Odom would have probably been able to regain the roadway.
DOTD, on the other hand, was aware of the dangers of the roadway and shoulder, as evidenced by the testimony of Mr. Perkins. Furthermore, DOTD not only failed to correct the defects in the roadway and shoulder, but also failed to erect any signs along the road warning of the hazardous defect. Clearly, DOTD was in a superior position to either remedy the defect or to warn motorists of the dangerous slope of the roadway. In addition, testimony by Mr. Perkins established that DOTD knew logging trucks constantly used the road. With their high center of gravity, a logging truck is especially susceptible to an excessively sloped roadway.
In Orillion v. Carter, 93-1190 (La.App. 1 Cir. 6/24/94) 639 So.2d 461, the first circuit decided a case very similar to the case at bar. In that case, Carter's vehicle was entering a curve when the vehicle's right tires dropped off the roadway and onto the shoulder. When the car attempted to reenter the roadway, it went into a counterclockwise spin and struck another vehicle traveling in the opposite direction. The trial court found the shoulder, which had a 3 to 1 slope, to be defective and extremely dangerous. DOTD offered testimony of expert witnesses who agreed that the shoulders were not maintained according to DOTD plans but opined that the 3 to 1 slope was traversable and recoverable. Id. The first circuit held that it was not manifest error for the trial court to find DOTD 50% at fault, due to the negligent *1092 construction and maintenance of the roadway and shoulder, and Carter 50% at fault for driving off the roadway. Id. In the present case, almost the same facts are presented. The shoulder of Highway 399 was negligently constructed, the right tires of Odom's vehicle left the roadway and entered the shoulder, Mr. Moore opined that the vehicle entered into a counterclockwise spin, and DOTD offered evidence that the roadway was traversable even though it was negligently constructed.
While the trial court found improper loading of the vehicle and driver error to be the main causes of the accident, although there was no factual basis for this finding, the supreme court has held that a driver's loss of control of his vehicle is not determinative in allocation of fault. Campbell, 648 So.2d 898. In Campbell, the driver of the vehicle fell asleep at the wheel and struck a bridge abutment that lacked a guardrail. While it was established that DOTD was negligent in not installing the guardrails and had knowledge that the guardrails were not in place, the appellate court overruled the trial courts determination that DOTD was more at fault than the driver. The appellate court adopted DOTD's contention that the lack of guardrails did not cause the driver to lose control of his vehicle and thus was not the cause in fact of the accident. In its reasons for reinstating the trial court's decision, the supreme court held that the driver's failure to maintain control of his vehicle did not relieve DOTD of its duty to maintain the highway in a safe condition. In so holding, the court viewed the accident as an event, not simply as the collision of the car with the bridge. Id. The court further held that in apportioning fault, courts should look not only at where fault lies for the accident but also where fault lies for the harm. Finally, the Court concluded that while the fault of the driver set the accident in motion, the driver had no control from that point on and it was primarily DOTD's negligence which led to the harm. Id.
The present case rests on a similar scenario. Mr. Moore testified that, had Odom tried to regain the roadway over a longer distance (the course of action recommended by Dr. Galli), the results would have been the same. It was his opinion that, due to the deficiencies in the roadway and shoulder, once the vehicle left the roadway, it had no chance to return. Even if Dr. Galli's findings, and the trial court's reliance upon them, are upheld, the harm to Odom was caused by the vehicle overturning down the excessively sloped shoulder. In other words, while Odom's negligence may have set the course for the accident to happen, his death would not have occurred but for the excessive slope of the roadway and shoulder. To find that the defective and excessive slope in the shoulder of the roadway had no connection to the accident is unreasonable.
In the present case, there was no evidence (supported by fact) that Odom's actions contributed to the accident. To the contrary, evidence showed that the recommended course of action for someone in Odom's position (attempting a gradual reentry onto the roadway) was taken. While drivers have a duty to control their vehicles on the roadway, this may not always be possible. Therefore, because driving on the roadway is not always possible, DOTD has a duty to maintain safe shoulders in order to protect a motorist who inadvertently leaves the roadway. In Campbell, the supreme court upheld a trial court's determination that DOTD was at fault in an accident where there was clear evidence that the driver fell asleep at the wheel. Unlike Campbell, however, there is no evidence to indicate why Odom left the roadway, nor is there any evidence that he was negligent in attempting to regain the roadway. Based on these facts and the supreme court's ruling in Campbell, we find that DOTD is 60% at fault for the accident and Odom is 40% at fault because he left the roadway.

DAMAGES
Because the trial court ruled in favor of DOTD, it did not reach the issue of damages. Since the record before us contains evidence as to damages for wrongful death, we may determine those damages and render judgment accordingly. La.Code Civ.P. art. 2164; Liberty Mut. Ins. Co. v. Snell, 517 So.2d 1050 (La.App. 3 Cir.1987); Jones v. P.K. Smith Chevrolet-Olds, Inc., 444 So.2d 1372 (La.App. 2 Cir.1984).

*1093 LOSS OF SUPPORT
Uncontraverted evidence introduced at trial established that the Odoms' loss of support, in terms of Mr. Odom's future wages, totaled $89,501.00. Accordingly, we find that the Odoms are entitled to that amount.

WRONGFUL DEATH DAMAGES
Pamela Odom seeks wrongful death damages on behalf of herself and her son, Christopher. Wrongful death damages include the elements of loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Evidence was presented at trial that Pamela and Charles Odom had a very close and loving marriage. Pamela married Charles when she was 19 years old, and Christopher was born two years later. The relationship between Christopher and his father was also very close, with Charles spending almost all of his time away from work with the family. Pamela and Christopher were totally dependent on Charles Odom, both financially and spiritually.
This court, in Rochelle v. State Through DOTD, 570 So.2d 13 (La.App. 3 Cir.1990), writ denied, 572 So.2d 93 (La.1991) held that the lowest award that could have been given to a spouse and children in a similar situation to be $250,000 for the spouse and $125,000 to each minor child. We concur with this assessment and award Pamela Odom $250,000 in wrongful death damages and Christopher Odom $125,000 in wrongful death damages.
SPECIAL DAMAGES
In addition to damages for wrongful death, Pamela Odom is entitled to special damages for funeral expenses. Both parties agreed that burial expenses were incurred in the amount of $3,503.21, and a tombstone in the amount of $1,402.38. We, therefore, award special damages totaling $4,905.59.

CONCLUSION
For the reasons discussed above, the judgment of the trial court is reversed. We find Mr. Odom 40% at fault and DOTD 60% at fault, and all awards should be adjusted accordingly. For the foregoing reasons, we award Pamela Odom $250,000 and Christopher Odom $125,000 for the wrongful death of Charles Odom. In addition, Pamela Odom is awarded special damages in the amount of $4,905.59, and damages for loss of support in the amount of $89,501.00. Costs of this appeal are assessed against DOTD.
REVERSED IN PART; REMANDED IN PART AND RENDERED.
PETERS, J., concurs.